Beatrice MORRIS, Plaintiff,

v.

Gilbert EVERSLEY, Officer of the Bayview Correctional Center, in his official and individual capacities, Alexandreena Dixon, Superintendent of Bayview Correctional Facility, in her official and individual capacities, and Elnora Porter, Assistant Deputy Superintendent of Programs of Bayview Correctional Facility, in her official and individual capacities, Defendants.

No. 00 Civ. 8166(DC).

United States District Court,
S.D. New York.

Sept. 23, 2003.

Milbank, Tweed, Hadley & McCloy LLP, by Scott A. Edelman, Esq., Courtney E. Scott, Esq., New York, NY, for Plaintiff.

Eliot Spitzer, Esq., Attorney General of the State of New York, by Jose L. Velez, Esq., Assistant Attorney General, New York, NY, for Defendants.

## OPINION

CHIN, District Judge.

In this case, plaintiff Beatrice Morris alleges that while she was incarcerated at Bayview Correctional Facility ("Bayview"), defendant Gilbert Eversley, a correctional officer, entered her cell one night and sexually assaulted her. Morris contends that Eversley's conduct is but one example of an ongoing pattern and practice at Bayview of male correctional officers engaging in sexual contact with female prisoners. By law, any such conduct would be improper, as inmates are deemed incapable of consenting to sexual contact with prison employees. Morris further contends that the supervisors were aware of the inappropriate and prevalent sexual conduct at Bayview because of the number of complaints lodged by female prisoners and one instance where an inmate became pregnant. Despite this knowledge, Morris claims, Bayview supervisors failed to act.

Morris brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants violated her rights under the Eighth Amendment to the Constitution and state law. Defendants Alexandreena Dixon and Elnora Porter move for summary judgment on the following grounds: (1) they are entitled to immunity under the Eleventh Amendment; (2) they were not "personally involved" in the alleged assault, and therefore are not subject to supervisory liability under § 1983; and (3) they are entitled to qualified immunity. For the reasons set forth below, the motion is granted.

## BACKGROUND

### A. Facts

#### 1. The Parties

Morris was incarcerated at Bayview for approximately three months, from March 1999 to June 1999. (Morris Dep. at 13). She was then transferred to the Taconic Correctional Facility ("Taconic"), from which she was released on November 15, 2000. (Id. at 13–14).

Eversley was employed by the New York State Department of Correctional Services ("DOCS") as a correctional officer and was assigned to Bayview at the time of the alleged assault in April 1999. (See Porter Aff. ¶ 2; Morris Dep. at 43–45, 53–54; Werbacher Dep. at 11, 135).

Dixon, another DOCS employee, was the Superintendent of Bayview from August 1990 to December 1998. (Dixon Aff. ¶ 1; Dixon Dep. at 8). She then became the Superintendent of Edgecombe Correctional Facility ("Edgecombe") from December 1998 to December 1999, after which she became the Superintendent of Taconic, a position she currently holds. (Dixon Aff. ¶ 1).

Porter, also employed by DOCS, was the Assistant Deputy Superintendent of Programs at Bayview from October 1998 to October 2001. (Porter Aff. ¶ 1; Porter Dep. at 8). In that role, she was in charge of all the program areas and supervised the librarians, educational program teachers, guidance counselors, and recreation area staff. (Porter Dep. at 11–12; Porter Aff. ¶ 3). In November 2001, Porter be-

came the Deputy Superintendent of Programs at Edgecombe. (Porter Aff. ¶ 1).

## 2. *The Assault*

On April 19, 1999, Eversley entered Morris's cell while she was sleeping. (Morris Dep. at 45, 130–31). When Morris was awakened by Eversley's touch, she asked him what he was doing there and told him to get out. (*Id.* at 45–46). Although Morris continued to tell Eversley "stop, get up" and "no," he refused. (*Id.* at 47). Eversley restrained her, forced himself upon her, and ejaculated on her thigh and the bed. (*Id.* at 46–48).

The morning after the assault, Morris cut out and saved the portion of the bed sheet on which Eversley had ejaculated. (*Id.* at 158, 182). Fearing she would be transferred if she reported the incident, Morris did not initially file a grievance or report the incident to prison officials. (*Id.* at 50, 64–65). "I just wanted to let it die, just let it end." (*Id.* at 50). On June 9, 1999, almost two months after the incident, Morris received a disciplinary ticket from Eversley accusing her of threats and smuggling. (*Id.* at 61–62). That same day, Morris approached Kenneth Werbacher, the Captain and then Deputy Superintendent of Security at Bayview from September 1996 to July 2002 (Werbacher Dep. at 11–12), to discuss the disciplinary ticket. (Morris Dep. at 62–63). Werbacher had received an anonymous tip about the incident and initiated a conversation with Morris about the assault. (*Id.* at 62–64; Werbacher Dep. at 88–89).

During her conversation with Werbacher, Morris turned over the portion of the bed sheet she had saved from the night of the incident. (Morris Dep. at 69). Werbacher put the sheet in an evidence bag and gave it to Darryl Warner, an investigator from the internal affair's unit of the Inspector General's office (the "IG's office") who happened to be in the building at the time. (Werbacher Dep. at 93–94; Warner Dep. at 8–9). Warner later forwarded the evidence to Faith Watson, an investigator in the sex crimes unit of the IG's office. (Watson Dep. at 6, 28–29; Warner Dep. at 13). Morris was transferred to Taconic shortly thereafter, for her own safety and protection. (Morris Dep. at 70; Watson Dep. at 17–19). Eversley, however, remained at Bayview pending investigation of the allegation against him. (*See* Watson Dep. at 19–20; Werbacher Dep. at 11, 135).

The portion of the sheet that Morris had saved was sent to be tested; on December 9, 1999, laboratory tests confirmed the presence of semen. (Watson Dep. at 30–32; Scott Decl. Ex. 12). The IG's office then contacted the New York County District Attorney's Office (the "DA's office") to present the case and potentially pursue criminal charges. (Watson Dep. at 36, 40–41). On July 16, 2002, the DNA profile of the semen on Morris's bed sheet was found to match Eversley's DNA profile. (Scott Decl. Ex. 13). Eversley was put on administrative leave on July 24, 2002, suspended on July 29, 2002, and dismissed from service on July 31, 2002. (Dixon Aff. ¶ 10; Velez Aff. Exs. C–E).

## 3. *Standard Procedures*

When allegations of a sexual nature arise, standard DOCS policy and procedure consist of immediately forwarding the complaint to the sex crimes unit of the IG's office for investigation. (Werbacher Dep. at 29–31; Dixon Dep. at 37–40; Porter Dep. at 38–39). No internal investigation is performed. (Dixon Dep. at 37–38). During the course of an investigation by the IG's office, the investigator conveys information to the superintendent or the head of security, Dixon and Werbacher in this case, not to any other staff members. (Watson Dep. at 41–42).

The authority for transferring a correctional officer from one facility to another rests with the Bureau of Labor Relations in Albany. (Watson Dep. at 19–20; Dixon Reply Aff. ¶ 6). Before an allegation is substantiated, it is often easier to transfer an inmate than an officer. (Porter Dep. at 119–20; Dixon Dep. at 83–84). In fact, the collective bargaining agreement between DOCS and the correctional officers' union does not allow any officer to be transferred, reassigned, suspended, or terminated because of an unsubstantiated allegation. (Dixon Reply Aff. ¶ 2). Any decisions regarding the suspension of a correctional officer also involve the Bureau of Labor Relations. (Watson Dep. at 109; Porter Dep. at 115–16).

#### 4. *Dixon's Involvement*

As Superintendent of Bayview, Dixon would have been informed of any allegations or complaints that were forwarded to the IG's office. (Dixon Dep. at 37–40). While Dixon was at Bayview, if inmate allegations of a sexual nature were brought to her attention, she would immediately forward all appropriate complaints to the IG's office for investigation. (Dixon Aff. ¶ 3).

During her tenure at Bayview, Dixon was not personally aware of past sexual allegations against Eversley, although Dixon does have a "vague memory" of referring one allegation against Eversley to the IG's office in 1996. (Dixon Dep. at 44–45; Dixon Aff. ¶ 5). Any allegations of sexual harassment, for example, would not be reflected in an officer's personnel file unless some disciplinary action was taken. (Dixon Dep. at 60–61). Although Bayview had approximately ten allegations of sexual

misconduct investigated by the IG's office each year, only two or three per year were substantiated, and the officers involved either resigned or were fired. (Dixon Reply Aff. ¶ 3).[1] Significantly, no allegations of sexual abuse against Eversley were substantiated. (*Id.*). Additionally, Dixon was aware of only one instance in which an inmate who was not in the work release program[2] became pregnant. (Dixon Aff. ¶ 8).

On April 19, 1999, the date Eversley allegedly assaulted Morris, Dixon was no longer the Superintendent of Bayview. (Dixon Aff. ¶¶ 1, 2; Morris Dep. at 45, 130–31). Dixon was unaware of the incident between Morris and Eversley until April 2000, approximately sixteen months after leaving Bayview. (Dixon Aff. ¶ 4). When she was informed about the incident itself, Dixon also learned that Werbacher had referred the allegation to the IG's office immediately upon becoming aware of the situation. (*Id.*).

#### 5. *Porter's Involvement*

On June 9, 1999, Morris wrote a letter about the assault. (Morris Dep. at 65). Initially, it was not addressed to anyone, but after a conversation with Anna Ramos, another inmate, Morris addressed the letter to Porter and then handed it to Werbacher during her conversation with him on that day—June 9, 1999. (*Id.* at 65–67; 85–86; 164–65). Porter was out of town at a conference and neither saw nor received the letter from Morris. (Porter Aff. ¶ 5; Porter Dep. at 91–92). Upon Porter's return, Werbacher informed her that Morris had brought allegations of a sexual nature against Eversley and that the case had

---

1. During the time in question, some 330 to 600 inmates were incarcerated at Bayview. (Werbacher Dep. at 11–12).

2. Inmates in the work release program are part of Bayview's minimal security annex. These inmates receive furloughs and have permission to leave the facility to see their families. (Porter Dep. at 26, 52–53).

been referred to the IG's office; he did not mention the existence of Morris's letter. (Porter Aff. ¶ 5; Porter Dep. at 35–36, 102).

During her tenure as Assistant Deputy Superintendent of Programs at Bayview, Porter never received any inmate complaints of a sexual nature against correctional officers, either personally or through the counselors she supervised. (Porter Dep. at 28, 31, 92–93). Porter was not aware of any rumors at Bayview regarding inappropriate relationships between inmates and staff. (*Id.* at 19–20). She was aware of one instance in which a correctional officer turned in his badge because of an investigation into improper sexual conduct, and three instances in which work release inmates got pregnant. (*Id.* at 44–45, 52–53).

Porter had no supervisory authority over any correctional officers or other security staff. (Porter Aff. ¶ 2).

## B. *Prior Proceedings*

Morris brought this action by submitting her pro se complaint to the Court's Pro Se Office on August 2, 2000. She was granted *in forma pauperis* status, and the complaint was filed on October 25, 2000. The Court later appointed counsel for Morris, and she filed an amended complaint on January 18, 2002. On March 15, 2002, defendants Dixon, Porter, Warner, and Watson moved to dismiss the complaint, and the Court heard oral argument on the motion on May 24, 2002. After oral argument, Morris discontinued her claims against Warner and Watson.[3] The motion to dismiss was denied by memorandum decision dated June 13, 2002. *See Morris v. Eversley,* 205 F.Supp.2d 234 (S.D.N.Y. 2002). Following discovery, defendants

Dixon and Porter moved for summary judgment.[4]

## *DISCUSSION*

Morris seeks relief pursuant to 42 U.S.C. § 1983, alleging that defendants violated her rights under the Eighth Amendment to the Constitution and state law. Defendants Dixon and Porter move for summary judgment on the grounds that (1) claims against them in their official capacities are barred by the Eleventh Amendment; (2) they have no supervisory liability under § 1983 because they were not personally involved in the alleged assault; and (3) they are entitled to qualified immunity.

## A. *Applicable Law*

### 1. *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* 477 U.S. at 248, 106 S.Ct. 2505; *see Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991). A factual

---

**3.** Morris filed a notice of voluntary dismissal pursuant to Fed.R.Civ.P. 41(a) as to defendants Warner and Watson on June 4, 2002.

**4.** Defendant Eversley joins in defendants Dixon and Porter's motion for summary judgment, by notice dated March 5, 2003.

issue is genuine if it can reasonably be resolved in favor of either party. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. A fact is material if it can affect the outcome of the action based on the governing law. *Id.* at 248, 106 S.Ct. 2505.

The party seeking summary judgment must demonstrate the absence of genuine issues of material fact, and then the nonmoving party must set forth facts proving that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 321–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. The nonmoving party "must present concrete particulars and cannot succeed with purely conclusory allegations." *Fitch v. R.J. Reynolds Tobacco Co.,* 675 F.Supp. 133, 136 (S.D.N.Y.1987) (internal quotations omitted). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. As the Court held in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted). The plaintiff must provide the Court with some basis to believe that his "version of relevant events is not fanciful." *Christian Dior–New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 38 (2d Cir.1986) (internal quotations omitted).

#### 2. *Eleventh Amendment*

 Under the Eleventh Amendment, absent waiver by the state or valid congressional override, state employees in their official capacities are not amenable to suit for money damages. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Ken-*

*tucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir. 2000). "States—and state officers, if sued in their official capacities for retrospective relief—. . . are not 'persons' subject to suit under § 1983." *K & A Radiologic Tech. Servs., Inc. v. Comm'r of Dep't of Health,* 189 F.3d 273, 278 (2d Cir.1999); *see also Delgado v. N.Y. City Dep't of Correction,* 797 F.Supp. 327, 328 (S.D.N.Y.1992) (holding that under the Eleventh Amendment a prisoner's civil rights suit alleging assaults and denial of medical treatment was barred as against the New York State Department of Correctional Services). State employees in their individual capacities, however, may be liable for damages under § 1983, even when the conduct in question is related to their official duties. *Arizonans for Official English v. Arizona,* 520 U.S. 43, 69 n. 24, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).

#### 3. *Section 1983*

 To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that: (1) the defendants acted under "color of state law" (2) to deprive plaintiff of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States. *Shabazz v. Vacco,* No. 97 Civ. 3761(DC), 1998 WL 901737, at *2 (S.D.N.Y. Dec.28, 1998) (citing *Pitchell v. Callan,* 13 F.3d 545, 547–48 (2d Cir.1994)); *see also Am. Mfrs. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). An individual defendant is not liable under § 1983 absent personal involvement. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Morris,* 205 F.Supp.2d at 241.

#### a. *Personal Involvement*

 Personal involvement of a defendant in an alleged constitutional deprivation is "a prerequisite to an award of dam-

ages under § 1983." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (internal quotations and citation omitted); *see also Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir. 1995) ("[T]o establish a § 1983 claim for the deprivation of a protected liberty or property interest without due process, a plaintiff must ... show that the defendants were personally involved in the unconstitutional conduct."); *Casaburro v. Giuliani,* 986 F.Supp. 176, 182 (S.D.N.Y. 1997). Liability may not be premised on the *respondeat superior* or vicarious liability doctrines, "[n]or may a defendant be held liable merely by his connection to the events through links in the chain of command." *Reynolds v. Goord,* No. 98 Civ. 6722(DLC), 2000 WL 235278, at *7 (S.D.N.Y. Mar.1, 2000).

 Direct participation, however, is not necessary. A supervisory official may be personally liable if she has "actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989). Thus, the personal involvement of a supervisory defendant may be shown by evidence that "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams,* 781 F.2d at 323–24).

### b. Eighth Amendment

 The Eighth Amendment prohibits the infliction of "cruel and usual punishment" on those convicted of crimes. U.S. Const. amend. VIII. An official violates the Eighth Amendment where (1) the alleged "punishment" is "objectively, sufficiently serious," and (2) the official involved has a "sufficiently culpable state of mind." *Boddie v. Schnieder,* 105 F.3d 857, 860–61 (2d Cir.1997) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation and internal quotations omitted)); *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). The Second Circuit has held that sexual abuse by a corrections officer violates a prisoner's right to be free from cruel and unusual punishment. *Boddie,* 105 F.3d at 861 ("[S]exual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is 'simply not part of the penalty that criminal offenders pay for their offenses against society.'" (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970)).

### 4. Qualified Immunity

 "The doctrine of qualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996); *see also Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) ("[Q]ualified immunity ... shields public officials from liability for their discretionary acts that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (internal quotations omitted)). Even when a plaintiff's federal rights are well-defined, a defendant may successfully claim qualified immunity "if it was objec-

tively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991).

The use of summary judgment by government officials claiming qualified immunity is expressly encouraged to reduce the burden of defending insubstantial suits. *See Harlow v. Fitzgerald,* 457 U.S. 800, 815–16, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Cartier v. Lussier,* 955 F.2d 841, 844 (2d Cir.1992) (holding that defendants claiming qualified immunity to § 1983 action were entitled to summary judgment where factual disputes were not material).

In short, a plaintiff's claims will withstand summary judgment only if she presents some evidence upon which a reasonable fact finder could find that (i) defendants violated well-established federal rights and (ii) it was not objectively reasonable for defendants to believe that their conduct did not violate those rights.

### B. *Application*

#### 1. *Eleventh Amendment*

 Although Morris purports to sue all defendants in both their individual and official capacities, she may sue them only in their individual capacities. Here, all of the defendants are DOCS employees and are therefore immune from suit in their official capacities under the Eleventh Amendment. Moreover, "[s]tates—and state officers, if sued in their official capacities for retrospective relief—... are not 'persons' subject to suit under § 1983." *K & A Radiologic,* 189 F.3d at 278. Summary judgment is therefore granted as to all claims against defendants in their official capacities.

#### 2. *Personal Involvement*

 Defendants Dixon and Porter argue that they cannot be held responsible for Morris's injuries under § 1983 because they were not personally involved in the deprivation of her constitutional rights. Personal involvement may be found by (1) direct participation in the alleged constitutional violation; (2) failure to remedy the wrong after being informed through a report or an appeal; (3) creation of a policy or custom under which unconstitutional practices occurred or allowed the continuation of such policy or custom; (4) gross negligence in supervising subordinates who committed the wrongful acts; or (5) deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon,* 58 F.3d at 873 (citing *Wright,* 21 F.3d at 501).

Morris contends that Dixon and Porter had actual or constructive knowledge of constitutional violations and are therefore liable for failing to remedy the wrong, creating a policy or custom allowing such violations of constitutional rights, gross negligence in supervising DOCS employees, and deliberate indifference to unconstitutional conduct. Because no reasonable jury could conclude that Dixon and Porter were personally involved in the assault on Morris, summary judgment is granted as to the supervisory liability claim under § 1983 for lack of personal involvement.

#### a. *Direct Participation*

Direct participation in the alleged constitutional violation is the first method by which to establish personal involvement. There is no evidence in the record to support an allegation that Dixon or Porter directly participated in Morris's assault. In fact, Morris does not dispute that Dixon and Porter were not directly involved:

Q. Did you think that Superintendent Dixon was involved in the April 18, 1999 incident in any way?

. . . .

A. Not personally.

Q. Do you think that Deputy Superintendent Porter was involved in the incident?

A. Not personally.

(Morris Dep. at 86–87).

#### b. *Failure to Remedy a Known Wrong*

A second method of establishing personal involvement is to provide evidence that a defendant was informed of the constitutional violation and did nothing to remedy the wrong. Despite the fact that neither Dixon nor Porter had supervisory authority over Eversley at the time the assault was reported, *see infra* Part B.2.d, Morris alleges that they knew about the allegation against Eversley but failed to investigate or remove Eversley from his position at Bayview. (Am.Compl.¶¶ 33, 49).

When a supervisor refers allegations to the IG's office for "appropriate action," this Court has found no failure to act and therefore no personal involvement. *Eng v. Coughlin*, 684 F.Supp. 56, 66 (S.D.N.Y. 1988) (finding supervisor who forwarded complaint to IG's office did not fail to take action to protect plaintiff). Upon learning of Morris's sexual assault allegation, Werbacher immediately forwarded the complaint to the IG's office for further investigation. (Werbacher Dep. at 93–94). When Dixon and Porter were first informed of the allegation itself, they also learned that Werbacher had sent the complaint to the IG's office. (Dixon Aff. ¶ 4; Porter Aff. ¶ 5). An initial referral to the IG's office is in keeping with standard DOCS policy for allegations of a sexual nature. (Werbacher Dep. at 30–31; Dixon Dep. at 37–40; Porter Dep. at 38–39). "We see no reason why [the superintendent] should have intervened in advance of an established procedure in which [plaintiff] was to be given the opportunity to substantiate [her] claim...." *Colon*, 58 F.3d at 873 (finding that no reasonable

jury could hold superintendent liable where he took no action to investigate pending a Tier III hearing). Even if Dixon or Porter had supervisory authority over Eversley, the action taken to address Morris's allegation—referral to the IG's office for further investigation—does not show a failure to investigate, as Morris argues.

As for not removing Eversley from his position at Bayview, even if Dixon were still the superintendent, neither Dixon nor Porter had the authority to take such action. Decisions about transferring correctional officers are made by the Bureau of Labor Relations, not the superintendent of the facility. (Watson Dep. at 19–20; Dixon Reply Aff. ¶ 6). In keeping with the collective bargaining agreement between DOCS and the correctional officers' union, Eversley could not be transferred, reassigned, or otherwise disciplined based only on an unsubstantiated allegation. (Dixon Reply Aff. ¶ 2). When Morris's allegation against Eversley was substantiated, Eversley was suspended and eventually fired. (Dixon Aff. ¶ 10; Velez Aff. Exs. C–E).

Although Eversley remained at Bayview pending substantiation of the claim against him, once Morris brought her allegation of sexual misconduct to Werbacher, she was transferred to another facility for her safety and protection. (Watson Dep. at 17–19). Morris was put in a special unit, monitored closely, and then transferred to another facility at the first opportunity. (*Id.* at 18–19). As Watson explained, "I had to make sure she was protected from the person that she's alleging who committed [the assault] and from anyone else who could be associated with him." (*Id.* at 19).

Here, Morris's allegation was forwarded to the IG's office for investigation as per standard procedure, the transfer of correctional officers fell under the authority of the Bureau of Labor Relations rather than

that of the superintendent, and Eversley and Morris were separated following her report of the assault. In light of these undisputed facts, I conclude that a reasonable jury could not find personal involvement by Dixon or Porter based on their purported failure to remedy a wrong.

### c. *Policy or Custom*

■ Personal involvement may also be shown through evidence of a policy or custom that permits unconstitutional practices to occur or continue. "A policy or custom may be inferred from acts or omissions of supervisory officials serious enough to amount to gross negligence or deliberate indifference to the constitutional rights of the plaintiff." *Eng*, 684 F.Supp. at 65; *cf. Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir.1995) ("[D]eliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate...."). Morris contends that sexual misconduct between inmates and prison staff was so rampant, as evidenced by numerous sexual allegations against employees, that Dixon and Porter must have known about it and through their inaction condoned it.

Morris presents no evidence, however, from which a reasonable jury could find that Dixon or Porter created an environment in which the violation of inmates' constitutional rights was encouraged and tolerated. *Cf. Sarus v. Rotundo*, 831 F.2d 397, 401–02 (2d Cir.1987) (finding no municipal policy of deliberate indifference where plaintiff provided no evidence of inadequate training and supervision, no evidence that other municipalities utilized different procedures, and some evidence that disciplinary actions had been institut-

ed against other officers). Both Dixon and Porter testified that if allegations of a sexual nature were brought to their attention, they would forward them to the IG's office for further investigation. (Dixon Aff. ¶ 3; Porter Aff. ¶ 4). When Dixon was superintendent of Bayview, she would also begin monitoring staff when she became aware of rumors regarding sexual activity between an inmate and employee. (Dixon Dep. at 47–48). "When the buzz started, we started monitoring." (*Id.* at 48). Although there were two or three substantiated allegations per year, the officers involved were disciplined—they resigned or were fired. (Dixon Reply Aff. ¶ 3).

In keeping with these policies, once Morris brought her allegation to Werbacher's attention, the case was immediately forwarded to the IG's office. (*See* Werbacher Dep. at 93–94; Warner Dep. at 8–9). When the allegation was found to be substantiated, Eversley was suspended and fired shortly thereafter.[5] (Dixon Aff. ¶ 10; Velez Aff. Exs. C E). Such actions comport with standard DOCS procedure and contradict the assertion that the supervisors at Bayview created a policy and custom of unconstitutional practices. No reasonable jury could find otherwise.

### d. *Grossly Negligent Supervision*

A fourth method of establishing personal involvement arises through a showing that Dixon and Porter were grossly negligent in supervising Eversley. Morris contends that Dixon and Porter negligently hired, trained, and supervised their subordinates. Because Dixon and Porter had no supervisory authority over Eversley, no reason-

---

**5.** Approximately three years passed between the date Morris reported the assault and the date Eversley's DNA was found to match with that of the semen found on the sheet. (*See* Scott Decl. Exs. 12–13). The investigation was under the supervision of the IG's office, not Dixon or Porter.

able jury could find personal involvement based on grossly negligent supervision.

■ An official with no "hiring, firing, or disciplinary power over any supervisory staff or personnel of the correctional facilities ... [or] no direct power to control or direct the customs and policies of the facilities" has no personal involvement in the unconstitutional conduct, and a claim under § 1983 cannot be sustained as to that individual. *Brody v. McMahon,* 684 F.Supp. 354, 356 (N.D.N.Y.1988); *see also Van Pelt v. Finn,* No. 92 Civ. 2977(MBM), 1993 WL 465297, at *7 (S.D.N.Y. Nov.12, 1993) (finding no personal involvement where defendants acted as advisors, rather than supervisors). When an individual "does not have any say over supervisory decisions," summary judgment is warranted, because personal involvement is lacking. *Walker v. Pataro,* No. 99 Civ. 4607(GBD)(AJP), 2002 WL 664040, at *14–15 (S.D.N.Y. Apr. 23, 2002) (internal quotations omitted); *see also Ramos v. Artuz,* No. 00 Civ. 0149(LTS)(HBP), 2003 WL 342347, at *12 (S.D.N.Y. Feb. 14, 2003) (granting summary judgment where defendant Regional Health Services Administrator did not supervise the health care providers alleged to have violated plaintiff's constitutional rights); *Saar v. United States Dep't of Justice,* 705 F.Supp. 999, 1006 (S.D.N.Y.1989) ("If defendant ... had no control over plaintiff's segregation, he cannot be held personally liable for any [constitutional] violations arising out of that segregation.").

Neither Dixon nor Porter had supervisory authority over Eversley at the time of the alleged assault on Morris. Because Dixon was no longer the Superintendent of Bayview at the time of Morris's assault in 1999 (*see* Dixon Aff. ¶ 1), she had no authority over Eversley, who remained at Bayview until at least July 2002. (Werbacher Dep. at 11, 135). Porter also had no supervisory authority over Eversley.

As the Assistant Deputy Superintendent of Programs at Bayview from October 1998 to October 2001, she supervised the program staff but had no supervisory authority over any security staff, including correctional officers. (Porter Aff. ¶¶ 1–3). In particular, Porter did not directly supervise Eversley. (Porter Dep. at 58). Summary judgment as to both Dixon and Porter is therefore warranted; because of their lack of supervisory authority over Eversley, a reasonable jury could only conclude that Dixon and Porter were not personally involved.

Additionally, Morris presents no evidence that the training and supervision of correctional officers were inadequate. She argues that "the record demonstrates that, despite knowledge of sexual misconduct occurring at Bayview, Defendants failed to adequately supervise those officers, including Eversley." (Pl.'s Opp'n at 25). This statement is not supported by a single citation to the record. Morris continues: "The prevalence of allegations of sexual misconduct at Bayview should have put Defendants on notice that the offsite training was inadequate and that additional steps such as supplemental training were necessary to discharge their duties to the inmates." (*Id.*). Such conclusory statements, without more, are not sufficient to defeat summary judgment.

### e. *Deliberate Indifference*

■ Finally, personal involvement may arise through deliberate indifference to the rights of inmates by a failure to act on information that unconstitutional acts are occurring. "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. Morris asserts that Dixon and Porter knew or should have known of constitutional violations at Bayview, were aware of

a serious risk of harm, and failed to take action. "Where supervisors are aware of misconduct but do nothing to alleviate it, they cannot escape liability." (Pl.'s Opp'n at 23).

If a supervisor investigates an inmate's grievances and finds them to be unsubstantiated, there is "nothing in the record indicating that [defendant] ... turned a blind eye." *Moncrieffe v. Witbeck*, No. 97 Civ. 253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000). Similarly, if a supervisor refers allegations to the IG's office for "appropriate action," "it cannot be said that [defendant] failed to take action to protect [plaintiff]." *Eng*, 684 F.Supp. at 66. Anytime an inmate allegation of sexual misconduct arose, both Dixon and Porter testified that they forwarded it to the IG's office for further investigation, as per DOCS procedure. (Dixon Aff. ¶ 3; Porter Aff. ¶ 4).

Here, Morris's allegation of sexual misconduct against Eversley was immediately referred to the IG's office for investigation and then subsequently forwarded to the DA's office. Morris was also separated from Eversley as soon as possible and transferred to another facility for her own protection. Nevertheless, Morris argues that Dixon and Porter should have known that there were a number of prior allegations of a sexual nature against Eversley and because they did nothing to protect the other inmates from this "serious risk of harm"—such as monitor Eversley more closely—they therefore exhibited deliberate indifference. (Pl.'s Opp'n at 24; *see* Dixon Aff. ¶ 5). Because the prior sexual misconduct allegations against Eversley were unsubstantiated and Eversley's post assignments put him primarily in the arsenal with limited inmate contact, no increased monitoring was put into place. (Watson Dep. at 51–53; Dixon Aff. ¶¶ 5–6). Taking all these factors together—referring the allegation to the IG's office,

transferring Morris to Taconic for safety reasons, not monitoring Eversley after various unsubstantiated sexual misconduct allegations when his position required limited contact with inmates—I hold that a reasonable jury could only conclude that Dixon and Porter did not exhibit deliberate indifference to unconstitutional conduct at Bayview. I therefore grant summary judgment to Dixon and Porter for lack of personal involvement under § 1983.

### 3. *Qualified Immunity*

Defendants also argue that they are entitled to qualified immunity. Because I am granting summary judgment as to supervisory liability under § 1983 for lack of personal involvement, I do not reach the qualified immunity argument.

### *CONCLUSION*

This case is a troubling one. A correctional officer entered an inmate's cell, at night, while she was sleeping, and sexually assaulted her. Although I am granting summary judgment in favor of Dixon and Porter on the basis that they cannot be held personally responsible for Eversley's actions, the issues remain as to whether DOCS, as an institution, failed in some respect, and whether the State must bear some responsibility. Surely, Eversley should not have been put in a position where he could harm an inmate as he did here.

Because of the Eleventh Amendment, however, these issues are not for this Court to resolve. Rather, if Morris wishes to pursue this matter against the State, she must proceed under § 24 of the New York Correction Law:

Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties

of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24(2) (McKinney 2003). Accordingly, the claims against Dixon and Porter individually are dismissed with prejudice and without costs. The claims against Dixon and Porter in their official capacities are dismissed without prejudice to the filing of claims against the State in the New York State Court of Claims.

Eversley has purported to join in Dixon and Porter's motion. To the extent he seeks dismissal of the claims against him personally, his motion is denied.

Counsel for Morris and Eversley shall appear for a pretrial conference on September 26, 2003, at 10:30 a.m., in Courtroom 11A of the United States Courthouse, 500 Pearl Street, New York, New York.

SO ORDERED.