**Beatrice MORRIS, Plaintiff,**

v.

**Gilbert EVERSLEY, Defendant.**

No. 00 Civ. 8166(DC).

United States District Court,
S.D. New York.

Nov. 9, 2004.

Milbank, Tweed, Hadley & McCloy LLP by Joseph S. Genova, Elena A. Agarkova, Atara Miller, Anthony Joseph Rotondi, New York, New York, for Plaintiff.

Hinman Straub P.C. by James T. Potter, David Novak, Albany, New York, for Defendant.

## *OPINION*

CHIN, District Judge.

In this case, plaintiff Beatrice Morris was sexually assaulted by defendant Gilbert Eversley in April 1999, when she was an inmate and he was a corrections officer at the Bayview Correctional Facility ("Bayview"), a women's prison. One night, while Morris was sleeping, Eversley entered her cell and attempted to rape her.

A few weeks before she was released from prison, Morris brought this action for damages *pro se* under 42 U.S.C. § 1983 and state law against Eversley and other corrections officials. She eventually obtained counsel, and all claims but the § 1983 claim against Eversley were dismissed.

The remaining claim against Eversley was tried twice. In the first trial, the jury found that Eversley had violated Morris's rights by subjecting her to cruel and unusual punishment, but awarded her only $500 in compensatory damages and $7,500 in punitive damages. In the second trial, which was limited solely to the amount of damages, the jury—a different jury—awarded Morris only $1,000 in compensatory damages and $15,000 in punitive damages.

Morris moves for attorneys' fees and costs, seeking an award of $295,818.00 in fees and $58,228.23 in costs.

Eversley opposes the application. First, raising an issue of first impression, he argues that any fee award is subject to the Prison Litigation Reform Act (the "PLRA"), which caps attorneys' fees in "any action brought by a prisoner who is confined to any jail, prison, or other correctional facility" to 150% of the recovery. 42 U.S.C. § 1997e(d). Eversley argues that the cap applies even though Morris was released from prison two-and-a-half weeks after filing suit. Under this theory, Morris's fees would be limited to $24,000—150% of her recovery of $16,000. Second, he argues that even if the PLRA cap does not apply and the Court applies the traditional lodestar method to calculate fees, the requested fees and costs are grossly excessive.

As set forth below, I hold that the PLRA cap on fees does not apply to this case. Accordingly, I apply the lodestar method, and award Morris fees of $154,900 and costs of $25,000.

## BACKGROUND

### A. The Facts

Early on April 20, 1999, Eversley, then a corrections officer at Bayview, used a master key to unlock Morris's cell. *Morris v. Eversley,* No. 00 Civ. 8166, 2004 WL 171337, at *1 (S.D.N.Y. Jan.29, 2004). He entered, without asking Morris's permission, as she was still sleeping. *Id.* Morris awoke when Eversley touched her. *Id.* She ordered him to get out, but he refused and attempted to rape her. *Id.*

Eversley was unable to penetrate Morris, and instead ejaculated on her leg and bed. *Id.* The next morning, using a pair of nail clippers, Morris cut out a piece of her sheet that had been stained by Eversley's semen. *Id.* She eventually reported the assault to prison officials and handed over the piece of stained sheet. *Morris v. Eversley,* 282 F.Supp.2d 196, 199 (S.D.N.Y. 2003). DNA testing later confirmed that the semen on the sheet was, to a virtual certainty, Eversley's. *Morris,* 2004 WL 171337, at *1. Any such sexual conduct by Eversley was, by law, unlawful because inmates are deemed incapable of consenting to sexual contact with prison employees. *Id.* (citing N.Y. Penal Law § 130.05(3)(e) (McKinney 2004)).

### B. Procedural History

On October 25, 2000, while incarcerated at the Taconic Correctional Facility, Morris filed a complaint *pro se* in this Court against Eversley, the New York State Department of Correctional Services, Superintendent Alexandreena Dixon, Assistant Deputy Superintendent of Programs Elnora Porter, and Captain Kenneth Werbacher. *See Morris v. Eversley,* 205 F.Supp.2d 234 (S.D.N.Y.2002). Morris alleged violations of her rights under federal and state law. (Def.'s Aff., Ex. A).

Morris was released from prison on November 10, 2000, two-and-a-half weeks after filing her complaint. (Def.'s Aff., Ex. B). Milbank, Tweed, Hadley & McCloy LLP ("Milbank") was retained to represent her on a *pro bono* basis on December 17, 2001. (Pl.'s Mem. at 2). On January

18, 2002, with the assistance of counsel, Morris filed an amended complaint, asserting new facts, adding new defendants, and adding new allegations. She asserted claims under 42 U.S.C. § 1983 as well as state law claims for assault and battery and intentional infliction of emotional distress. *Id.* At the time Morris filed her amended complaint the statute of limitations governing her § 1983 claim had not expired. *See Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir.2004) ("The statute of limitations applicable to claims brought under §§ 1981 and 1983 in New York is three years."). Defendants had not filed an answer or motion for summary judgment at the time she filed her amended complaint. (Pl.'s Reply Mem. at 1).

On March 15, 2002, Dixon and Porter moved to dismiss the complaint on multiple grounds, including failure to exhaust administrative remedies pursuant to § 1997e(a) of the PLRA. *Morris*, 205 F.Supp.2d 234. After oral argument on May 24, 2002, Morris discontinued her claims against two defendants added in the amended complaint. On June 13, 2002, I denied the remaining defendants' motion to dismiss this action, noting:

> The PLRA requires exhaustion of 'such administrative remedies as are available.' Thus, even if I were to dismiss Morris's claims, no administrative remedies are 'available' to her because she is no longer a prisoner; Morris could simply refile her § 1983 claims unaffected by the PLRA's exhaustion requirement.... [C]onsiderations of judicial efficiency and economy advise against dismissal of Morris's claims.

205 F.Supp.2d at 241 (citations and footnote omitted).

Following discovery, defendants Dixon and Porter, joined by Eversley, moved for summary judgment. On September 23, 2003, I granted the motion for summary judgment as to the supervisory defendants only. *Morris*, 282 F.Supp.2d at 208–09. Morris and Eversley thereafter stipulated to the dismissal of all remaining claims except the 42 U.S.C. § 1983 claim. (Pl.'s Mem. at 2).

On January 28, 2004, after a three-day trial on the § 1983 claim, a jury found that Eversley acted intentionally and maliciously and violated Morris's Eighth Amendment right to be free from cruel and unusual punishment. *Morris*, 2004 WL 171337, at *1. The jury, however, awarded Morris only $500 in compensatory and $7,500 in punitive damages. *Id.* In an order issued February 26, 2004, the Court held that the jury's damages were so grossly inadequate as to shock the conscience, vacated the jury's verdict in part, and ordered a new trial on the issues of punitive and compensatory damages only. On April 21, 2004, after a two-and-a-half-day trial, a second jury awarded Morris $1,000 in compensatory and $15,000 in punitive damages. Judgment was entered in favor of Morris against Eversley for $1,000 in compensatory damages and $15,000 in punitive damages on April 23, 2004.

## C. *The Fee Application*

On May 7, 2004, Morris filed her motion, pursuant to 42 U.S.C. § 1988 and Rule 54(d) of the Federal Rules of Civil Procedure, to recover reasonable attorneys' fees and costs. Morris requests $295,818.00 in attorneys' fees and $58,228.23 in costs.

## DISCUSSION

I address first the threshold question of whether the PLRA restrictions on attorneys' fees applies to a case such as this, where the plaintiff in a prisoner's civil rights case is released from prison less than three weeks after filing suit and she asserts significant, meritorious, and ulti-

mately successful claims. As I conclude that the PLRA's restrictions do not apply, I then proceed to a traditional lodestar analysis.

## A. *Applicability of the PLRA* .

Eversley asserts that Morris's attorneys' fees award should be capped at 150% of her monetary award, or $24,000, pursuant to the PLRA, 42 U.S.C. § 1997e(d), because Morris was a prisoner when she filed her initial complaint. He asserts that the fact she was released from custody shortly after filing her complaint has no bearing on whether her attorneys' fees award is subject to the PLRA. He also argues that 25% of the $16,000 judgment, or $4,000, must be paid from the plaintiff's judgment to satisfy attorneys' fees, leaving $20,000 to be paid by the defendant.

### 1. *The Statute*

In 1996, Congress passed the PLRA, which "contains numerous provisions governing the course of prisoner litigation in the federal courts." *Martin v. Hadix*, 527 U.S. 343, 349–50, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999). The PLRA, codified in 42 U.S.C. § 1997e, was adopted with "the principal purpose of deterring frivo-

lous prisoner lawsuits and appeals." *Nicholas v. Tucker*, 114 F.3d 17, 19 (2d Cir. 1997), *cert. denied*, 523 U.S. 1126, 118 S.Ct. 1812, 140 L.Ed.2d 950 (1998). Section 1997e(d)[1] imposes "substantial restrictions" on attorneys' fees that can be awarded to a prisoner-plaintiff who succeeds on a civil rights claim, despite the allowances provided by 42 U.S.C. § 1988. *Blissett v. Casey*, 147 F.3d 218, 220 (2d Cir.1998).

The Second Circuit has interpreted § 1997e(d) to cap a defendant's liability for attorneys' fees at 150% of a plaintiff's monetary judgment in a civil rights case brought by a prisoner. *Torres v. Walker*, 356 F.3d 238, 242 (2d Cir.2004). Accordingly, a prisoner-plaintiff's attorneys' fees award is directly proportional to the monetary success of his or her claim. The PLRA also allows for a portion of the prisoner-plaintiff's judgment, up to but not to exceed 25% of the monetary value, to be applied to satisfy the payment of attorneys' fees, but does not provide courts with guidelines for determining the percentage (25% or below) to be applied. 42 U.S.C. § 1997e(d)(2).

The PLRA is not applicable to a plaintiff who is no longer a confined pris-

---

1. 42 U.S.C. § 1997e(d) provides, in relevant part:

(1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under [42 U.S.C. § 1988], such fees shall not be awarded, except to the extent that—
(A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under [42 U.S.C. § 1988]; and
(B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or
(ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

(2) Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.
(3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of title 18 [of the United States Code] for payment of court-appointed counsel.
42 U.S.C. § 1997e(d).

oner when the suit is filed. *See Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir.1998) (holding that the term "prisoner" does not comprehend a felon who has been released). If a plaintiff is a prisoner at the time a civil rights violation is suffered, but waits until release from custody before filing a complaint, the attorneys' fees restrictions of § 1997e are simply inapplicable. In such a case, the prevailing plaintiff is free to recover full reasonable attorneys' fees under § 1988. *See Greig v. Goord*, 169 F.3d 165, 167 (2d Cir.1999) (holding that a prisoner who files a civil rights action after release from confinement is not subject to the PLRA's statutory exhaustion requirement); *cf. Gibson v. Brooks*, 335 F.Supp.2d 325 (D.Conn.2004) (distinguishing *Greig* and holding that plaintiff who was incarcerated when civil rights claim accrued, then released, and then re-imprisoned at time he filed suit was subject to exhaustion requirements of PLRA).

The parties have not cited and the Court has not found any decision addressing the applicability of the PLRA restrictions on fees to a situation where a prisoner-plaintiff files suit while she is incarcerated but is released shortly thereafter.

### 2. *The Plain–Meaning Rule*

Eversley urges the Court to hold that the plain meaning of the statutory language of § 1997e(d) is that any plaintiff who *files* an action while he or she is incarcerated is subject to the limitations imposed by the statute, even if the individual is thereafter released. The language of § 1997e(d), however, does not plainly so provide.

Construction of a statute "must begin with the words of the text." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir.2003). The plain meaning of the words, however, must be considered "by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *Id.* at 345; *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). Whether the words are plain in their meaning or ambiguous, as the Supreme Court has held:

> [i]n the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress....
>
> ... When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination."

*United States v. American Trucking Ass'n, Inc.*, 310 U.S. 534, 542, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) (footnotes omitted). Hence, the apparent facial meaning of a statute does not preclude the Court's examination of the statute's purpose. *See Train v. Colo. Pub. Interest Research Group*, 426 U.S. 1, 10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976).

 The plain-meaning rule—the rule that the Court should rely on the literal, unambiguous language of a statute—is "rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists." *Boston Sand & Gravel Co. v. United States*, 278 U.S. 41, 48, 49 S.Ct. 52, 73 L.Ed. 170 (1928). The courts generally recognize two exceptions to the plain-meaning rule. First, courts need not adhere to the rule in cases where "literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and

those intentions must be controlling." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). The circumstances that compelled the enactment of a statute "may persuade a court that Congress did not intend words of common meaning to have their literal effect." *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981). Second, courts need not adhere to the plain meaning of the statute when doing so would lead to an absurd result that is "so gross as to shock the general moral or common sense." *Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 75 L.Ed. 156 (1930).

I discuss the words of the statute, the legislative intent, and, assuming the words of the statute have the plain meaning urged by Eversley, application of the exceptions to the plain-meaning rule.

### i. *The Words of the Statute*

I begin with an examination of the words of the statute. Section 1997e(d) provides that "[i]n any action brought by a *prisoner who is confined* to any jail, prison, or other correctional facility, in which attorney's fees are authorized under [section 1988], such fees shall not be awarded," except on the terms specified in the statute. 42 U.S.C. § 1997e(d)(1) (emphasis added).

Although Eversley argues that the plain meaning of the language is clear, I disagree. In my view, the language is not free from ambiguity. The words arguably impose two requirements: (1) the action must be brought by a "prisoner," and (2) the plaintiff must be presently confined (as indicated by the words "who *is* confined" (emphasis added)). If these two elements are not read individually, the terms "prisoner" and the phrase "who is confined" are arguably redundant, and the rule that each word and clause of a statute should be

given full effect arguably would be violated. *See Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 106 (2d Cir. 2004) ("Statutes should be construed, if possible, to give effect to every clause and word."). Other sections of the PLRA do not include the phrase "who is confined," further suggesting that both terms have meaning.

Significantly, if the plain words are placed in the context of the entire statute as well as Congress's intent in passing the statute, it becomes even more evident that the construction urged by Eversley is wrong. Accordingly, I hold that the words of § 1997e(d) do not plainly require the statute's application to a prisoner-plaintiff who is no longer "confined" when fees are incurred and awarded.

### ii. *Legislative Intent*

Whether the words are plain or ambiguous, the Court must consider the legislature's intent in enacting the PLRA. The statutory construction urged by Eversley is not consistent with the stated congressional purpose of the PLRA. The legislative record reveals that the PLRA's passage was guided by the desire to reduce the tremendous number of frivolous lawsuits filed by inmates and the high costs associated with those actions.

Senator Dole, speaking in support of the PLRA, noted that frivolous prisoner suits "can involve such grievances as insufficient storage locker space, a defective haircut by a prison barber, the failure of prison officials to invite a prisoner to a pizza party for a departing prison employee, and yes, being served chunky peanut butter instead of the creamy variety." 141 Cong. Rec. S14611–01 (daily ed. Sept. 29, 1995).

Senator Dole also noted that an estimated $81 million is spent each year defending such civil rights claims and that "most of

these costs are incurred defending lawsuits that have no merit whatsoever." *Id.* Senator Kyl read two lists into the congressional record: the "Top 10 Frivolous Inmate Lawsuits in Arizona," which cited a suit against corrections officials filed by a death row inmate for taking away his Gameboy electronic game, and the "Top 10 Frivolous Inmate Lawsuits Nationally," which cited an inmate civil rights claim seeking $1 million in damages because his ice cream had melted. *Id.*

Some senators, however, expressed hesitation about the breadth of the PLRA. Senator Biden urged Congress not to "lose sight of the fact that some of these lawsuits have merit—some prisoners' rights are violated." *Id.* He noted a case in the District of Columbia where correctional officers had sexually assaulted female prisoners on a regular basis and prison officials failed to act. He further argued that the PLRA placed "too many roadblocks to meritorious prison lawsuits." *Id.* Even Senator Hatch, a staunch supporter of the legislation, admitted that the PLRA was not intended to "prevent inmates from raising legitimate claims." *Id.*

This desire to ensure that meritorious prisoner civil rights claims can proceed is well founded. Sexual abuse of female prisoners by male corrections officers is a pervasive, well-documented, national problem. *See* Amy Laderberg, *The "Dirty Little Secret": Why Class Actions Have Emerged as the Only Viable Option for Women Inmates Attempting to Satisfy the Subjective Prong of the Eighth Amendment in Suits for Custodial Sexual Abuse,* 40 Wm. & Mary L.Rev. 323 (1998) ("[S]exual abuse of women inmates by their male guards is a pervasive and legitimate problem in both state and federal prisons of the United States.").

The sexual vulnerability of female prisoners was illuminated by testimony at Morris's second trial. Kenneth Werbacher, the former deputy superintendent for security at Bayview, who was responsible for the care of inmates and supervision of correctional staff while Morris was incarcerated, testified that sexual abuse of inmates was an ongoing problem at Bayview during his tenure. When asked during direct examination why he thought sexual abuse was such a serious problem at Bayview, he replied:

> Within the prison system there's a double standard. In a male jail, if a female staff member has sex with an inmate, the staff gets extremely indignant. They'll kick down my door to tell me about it. In a female jail it's different. The staff tends to look the other way.... It gives a boldness to the people that are doing it.

(R. at 170).

Werbacher also testified that the problem of sexual abuse of female prisoners by guards at Bayview was so serious that it compelled him to resign from his position. "It is what caused me to leave, that I had had enough.... I made several attempts through the state system to transfer.... I demoted myself in order to get myself transferred to another job." (R. at 170–71).

■ In light of the legislative intent driving the PLRA's passage and the need to ensure that meritorious prisoner civil rights suits can proceed, I conclude that the words of the statute must be interpreted so that § 1997e(d) is inapplicable to a case such as this, where the prisoner-plaintiff was released shortly after filing suit and did not engage lawyers until she was no longer confined in prison.

### iii. *Exceptions to the Plain–Meaning Rule*

Even assuming the words of the statute have the literal meaning urged by Evers-

ley, both exceptions to the plain-meaning rule would apply here.

First, literal application of the words of the statute, with Eversley's proposed construction, would be inconsistent with Congress's intent in passing the PLRA. As discussed above, Congress did not intend for prisoner-plaintiffs with meritorious claims to be lumped together with inmates who bring frivolous suits to entertain themselves while in prison.

Second, the "absurdity exception" to the plain-meaning rule would also apply. The construction urged by Eversley would lead to an illogical result by punishing prisoner-plaintiffs who were not the intended targets of the legislation but are subjected to its limitations because of mere happenstance.

As Eversley indicates, some courts have interpreted other PLRA provisions to rigidly apply to any plaintiff who filed a complaint while a prisoner. Few circuits, however, have addressed the scope of § 1997e(d) specifically. While Eversley's rigid construction may make sense for the PLRA sections that have been scrutinized by other courts, that same reasoning applied to § 1997e(d) in the instant case would lead to an absurd outcome.

Eversley cites *Harris v. Garner*, 216 F.3d 970 (11th Cir.2000), *cert. denied*, 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001), to support his argument that the "fact that Plaintiff was released during the pendency of the litigation has no bearing on the application of the statute, because the date the action was commenced is the controlling date." (Def.'s Mem. at 2).

*Harris* involved § 1997e(e) [2] of the PLRA, which sets out elements that must be met to *commence* an action. *Harris*, 216 F.3d at 974.

Eversley also relies on *Ahmed v. Dragovich*, 297 F.3d 201 (3d Cir.2002). That court also analyzed a different provision of the PLRA, § 1997e(a).[3] That section similarly deals with the PLRA requirement that a plaintiff exhaust administrative remedies to *commence* an action. I previously rejected the strict application of this section to Morris's case in addressing the defendants' motion to dismiss for failure to exhaust her administrative remedies. *See Morris*, 205 F.Supp.2d at 240–41.

Eversley also misreads the *Ahmed* court's denial of a former inmate's motion to amend his complaint to reflect his release from prison as requiring an analogous, technical application of § 1997e(d) in the instant case. In *Ahmed*, however, the court did not allow for a relation back amendment because the statute of limitations for the action had run. In this case, Morris could have amended her complaint as of right.

Section 1997e(d), unlike these other sections, addresses limitations on a suit that has already been filed and successfully litigated to conclusion. Neither side cites *Robbins v. Chronister*, No. 97–3489–DJW, 2002 WL 356331 (D.Kan. March 1, 2002), a case that offers a more persuasive model, as it directly addressed the language of § 1997e(d). That case involved a policeman who violated the plaintiff's Fourth Amendment rights by using excessive

---

**2.** Section 1997e(e) provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

**3.** Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

force during arrest. The incident occurred before the plaintiff was incarcerated, but the plaintiff did not file his action until he was a prisoner.

The *Robbins* court concluded that while the plain meaning of the statute supported the conclusion that the plaintiff's attorneys' fees should be limited by the PLRA because the plaintiff was a prisoner when the action was brought,[4] the absurdity exception to the plain-meaning rule applied.

The *Robbins* court was particularly persuaded by the legislative history surrounding the PLRA's enactment and that "[i]ronically, with this timing-based distinction, an individual who files his 'peanut butter' lawsuit—the type clearly targeted by the PLRA—after being released from prison is not subject to the PLRA at all." *Robbins*, 2002 WL 356331, at *6. The court also noted that it could "conceive of no rational justification for distinguishing between prisoner and non-prisoner litigants based upon when they file their lawsuits." *Id.* at *7 (footnote omitted). The court ultimately concluded that because the plaintiff's claim was not the typical frivolous lawsuit that Congress was attempting to prevent by passing the PLRA and because time-based distinctions in interpreting § 1997e(d) could result in an absurd outcome, the statute did not apply to the plaintiff in that case.

The reasoning of *Robbins* is instructive. Although Morris was a prisoner when she brought her action, she was released less than three weeks later. She was not confined for the overwhelming majority of the case, and Milbank was not retained until after her release. She was also released from prison before the defendant answered the complaint or filed a motion for summary judgment, and she was able to amend her complaint as a matter of right.

She did so. She also could have voluntarily discontinued her action and then refiled it—when she was no longer a "prisoner." *See Morris*, 205 F.Supp.2d at 241 (denying the defendants' motion to dismiss this action for failure to exhaust administrative remedies pursuant to § 1997e(a) because plaintiff could simply voluntarily discontinue and then refile suit).

Perhaps most significantly, if Morris had simply waited a few weeks to file her suit in the first place, the PLRA would not have been implicated at all. This was purely a matter of happenstance. It would be absurd to interpret § 1997e(d) to impose attorneys' fees limits on a plaintiff who files a successful, non-frivolous civil rights action while a prisoner, but is released from prison less than three weeks later and retains lawyers when she is no longer a prisoner. Accordingly, I hold that § 1997e(d) does not apply to this case.

## B. *The Lodestar Analysis*

I turn, then, to a traditional lodestar analysis of Morris's application for fees and costs.

### 1. *Applicable Law*

Under 42 U.S.C. § 1988, in civil rights actions "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." *See Raishevich v. Foster*, 247 F.3d 337, 344 (2d Cir.2001). The Second Circuit has explained that the award of attorneys' fees is designed to "'encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel.'" *Id.* (quoting *Kerr v. Quinn*, 692 F.2d 875, 877 (2d Cir. 1982)).

---

**4.** It is not clear whether the plaintiff in *Robbins* was still confined during the course of litigation or when he made his motion for attorneys' fees.

The Supreme Court has held that success on any significant issue in litigation that achieves "some of the benefit" sought is sufficient to qualify a plaintiff as a "prevailing party" for attorneys' fees purposes. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (internal quotations and citation omitted); *see Lyte v. Sara Lee Corp.*, 950 F.2d 101, 103 (2d Cir.1991). At a minimum, the plaintiff "must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782, 792, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) (citations omitted).

■ Additionally, under § 1988, a prevailing party is entitled to recover "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir.1998) (internal quotations omitted). The costs awarded under § 1988 include not only those ordinarily recoverable pursuant to 28 U.S.C. § 1920, Rule 54(d)(1) of the Federal Rules of Civil Procedure, and a judicial district's local civil rules, but also any additional costs ordinarily charged in the particular legal marketplace. *Anderson v. City of New York*, 132 F.Supp.2d 239, 245 (S.D.N.Y.2001).

#### i. *Lodestar Calculation*

Courts typically use a "lodestar" figure as an initial estimate of reasonable attorneys' fees. This figure is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate for each attorney or paralegal involved. *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir.1992) (citing *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989)).

■ Thus, using the lodestar approach, the Court assesses the reasonableness of the number of hours expended, as well as the reasonableness of the requested rates. Under § 1988, plaintiffs are entitled to reasonable hourly rates that fall within the prevailing marketplace rates "in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The relevant community for a fee determination is the judicial district in which the trial court sits—here, the Southern District of New York. *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 232 (2d Cir.1987). In addition to looking at prevailing marketplace rates, the Court may rely on its own knowledge of comparable rates charged by lawyers in the district. *Ramirez v. New York City Off–Track Betting Corp.*, No. 93 Civ. 0682, 1997 WL 160369, at *2 (S.D.N.Y. Apr.3, 1997).

#### ii. *Adjustments*

Although there is a "strong presumption" that the lodestar figure represents a reasonable fee, *City of Burlington v. Dague*, 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), "[t]he product of reasonable hours times a reasonable rate does not end the inquiry." *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. Other considerations may lead to an upward or downward departure from the lodestar. *Id.*

" '[T]he most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.' " *Farrar v. Hobby*, 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (quoting *Hensley*, 461 U.S. at 436, 103 S.Ct. 1933); *N.A.A.C.P. v. Town of East Haven*, 259 F.3d 113, 117 (2d Cir.2001). The Supreme Court has reasoned that if a plaintiff achieves only limited or partial success,

the lodestar amount may be excessive. *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933. "This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Id.*

In *Farrar,* the Supreme Court held that a plaintiff who wins only "nominal damages" is a prevailing party for purposes of a fee award under § 1988, but the Court also held that such a plaintiff's lack of success had to be considered in determining the amount of fees. 506 U.S. at 115, 113 S.Ct. 566.

At the same time, however, courts have expressly rejected a per se "proportionality" rule, i.e., proportionally linking the prevailing plaintiff's attorneys' fees to the degree of monetary success the plaintiff achieved. *City of Riverside v. Rivera,* 477 U.S. 561, 578, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). As the Supreme Court has held:

> A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts. This is totally inconsistent with Congress' purpose in enacting § 1988. Congress recognized that private-sector fee arrangements were inadequate to ensure sufficiently vigorous enforcement of civil rights. In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case.

*Id.* In *City of Riverside,* the Court upheld an award of $245,456.25 in fees even though plaintiffs had recovered only $33,350 in both compensatory and punitive damages. *Id.* at 564–67, 106 S.Ct. 2686.

These two concepts are not at odds. If a prevailing plaintiff recovers only limited monetary damages, that lack of success is to be considered by a court in setting the amount of attorneys' fees. Lack of monetary success, however, does not *require* a fee reduction. *See Ayres v. 127 Restaurant Corp.,* No. 96 Civ. 1255, 1999 WL 328348 (S.D.N.Y. May 21, 1999) (noting that attorneys' fees award should not be limited for proportionality where plaintiffs were "everyday workers" who were members of a restaurant's wait staff and their income, and therefore their monetary award, was modest). Rather, the degree of monetary success (or lack thereof) is only one factor to be considered. Courts must also consider whether the plaintiff has achieved some other measure of success.

In affirming an award of attorneys' fees that substantially exceeded plaintiffs' recovery, the Court in *Riverside* recognized that "a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards." *City of Riverside,* 477 U.S. at 574, 106 S.Ct. 2686. Thus a civil rights plaintiff may obtain important equitable or declaratory relief, or some other non-monetary vindication of his or her civil rights, by, for example, establishing the violation of an important constitutional right. These non-monetary measures of success must be considered as well in setting the amount of a fee award.

### 2. *Application*

Milbank submits that partners, senior associates, and associates worked on Morris's case on a *pro bono* basis for approximately 3,400 hours over a two-and-a-half year period, and that its attorneys recorded the rates they ordinarily charge paying clients. Milbank additionally states that Morris's request only represents fees incurred for legal work specifically related to the trial and retrial of her case, and that it has excluded fees for work prior to the

Final Pretrial Conference, Morris's claim in the New York Court of Claims, the supervisory time expended by partners and senior associates, and time expended by associates present at trial but not actively participating. Of the approximately 3,400 total hours Milbank spent on the case, 2,700 hours were spent on these uncharged activities. Morris therefore requests payment for approximately 700 hours of associate time plus payment for the time of administrative staff and costs.

Milbank's billing statement includes charges for the time of six associates at hourly rates of $315–395/hour. These associates graduated from law school between the years of 2001 and 2003. Milbank also requests payment for the time of several legal assistants and administrative staff at rates of $125–175/hour.

Eversley asserts that the rates charged by Milbank's associates are excessive in light of the type of litigation involved, counsel's failure to indicate how long its attorneys have been admitted to the bar, and the reimbursement rates that the State of New York is paying defendant's attorneys. He also argues that the number of hours and the number of attorneys Milbank devoted to the case are excessive and urges the Court to consider the limited financial success of Morris's action. Finally, Eversley argues that the request for costs is exorbitant and includes items that are not recoverable.

### i. *Lodestar Analysis*

The Court finds the rates charged by Milbank for associates' time are excessive in light of the type of litigation involved and the experience level of the associates who worked on the case. While rates of $315–395/hour for junior associates may be warranted for the corporate litigation that Milbank is accustomed to handling for large, fee-paying companies, these amounts exceed the rates usually charged by similarly experienced civil rights attorneys. *See Pastre v. Weber,* 800 F.Supp. 1120, 1125 (S.D.N.Y.1991) (concluding that defendant should not be required to pay the rates usually charged to clients such as General Motors or IBM, but should be required to pay the rates that "would have been charged by a competent attorney specializing in civil rights litigation"). Although one could debate whether substantially higher rates are warranted for a corporate lawyer with the same number of years experience as a civil rights lawyer, the fact is the markets and billing considerations are different. Moreover, Milbank took this case on as a pro bono matter, in part to give its young lawyers the experience of trying a case before a jury in federal court, and it would not be fair to Eversley to assess fees against him based on the same rates Milbank charges its large corporate clients for very different legal work.

■ I conclude that the appropriate rate is $200/hour for Milbank's associates, under all the circumstances and given the marketplace rates for similar legal services by other lawyers with one to three years' experience in this District. *See Betancourt v. Giuliani,* 325 F.Supp.2d 330, 333 (S.D.N.Y.2004) (concluding that an average hourly rate of $200 is reasonable for associate from major New York City law firm); *see also Marisol A. ex rel. Forbes v. Giuliani,* 111 F.Supp.2d 381, 386–88 (S.D.N.Y.2000) ("[A] reasonable rate scale [for civil rights cases in the Southern District of New York] is as follows: $350 for attorneys with more than fifteen years of experience, $300 for attorneys with ten to fifteen years of experience, $230–250 for attorneys with seven to nine years of experience, $180–200 for attorneys with four to six years of experience, and $130–150 for

attorneys with one to three years of experience.").

■ I also find that 712 hours is not excessive. Although six associates is excessive, Milbank is not seeking payment for a substantial portion of the 3,400 hours spent on the case. It has limited its fee application to time spent on the trial and the retrial. I would have awarded fees for some of the time spent on discovery, motion practice, and preparing the instant fee application, and hence I will award fees for 712 hours.

■ Morris requests payment for 172.60 hours of paralegal/legal assistant time. It appears from Milbank's billing statement that the paralegal/legal assistant who devoted the most time to the case, Mimi Einhorn, billed 97.5 hours at $155/ hour. That rate is high. I will allow 100 hours of paralegal time at $125/hour.

Finally, Eversley argues that the Court should limit Morris's attorneys' fees award because of her limited monetary success; the first jury awarded her only $500 in compensatory damages and $7,500 in punitive damages and the second jury, considering only damages, awarded her only $1,000 in compensatory and $15,000 in punitive damages.

■ The argument is rejected. I was baffled that the first jury awarded such low amounts, and yet the second jury did not award much more. It is hard to imagine that Morris could be made whole for the damages she suffered, including the loss of her dignity, by a mere $500 or $1,000 dollars in compensatory damages. *See Morris v. Eversley,* No. 00 Civ. 8166, 2004 WL 171337 (S.D.N.Y. Jan.29, 2004). Even if both juries had concluded that Morris had "consented" to the sexual contact—an allegation that Eversley never made—by law Morris could not consent. The fact that a prisoner, even a former prisoner, is unable to recover a fair mea-

sure of damages from a jury is not a basis for reducing a fee award.

Moreover, notwithstanding the amounts of the damages awarded, Morris and the Milbank lawyers still obtained a significant victory, one that undoubtedly will help to protect the civil rights of others. The non-monetary value of her victory, and Milbank's work, should not be underestimated. Accordingly, no deduction will be made because of the limited monetary value of Morris's recovery.

Accordingly, the Court will award Morris reasonable attorneys' fees of $154,900 consisting of fees for 712 hours of attorney time ($142,400) and 100 hours of paralegal time at $125/hour ($12,500).

### ii. *Costs*

Morris seeks to recover $4,478.39 in costs pursuant to 28 U.S.C. § 1920 for deposition transcripts, witness fees, and trial transcripts. Morris also seeks to recover $53,749.84 pursuant to 42 U.S.C. § 1988 for general office expenses, messenger fees, photocopying, binding, secretarial assistance, word processing, and electronic legal research.

The requested costs, particularly office expenses and electronic legal research costs, are excessive. I will award costs of $25,000.

### CONCLUSION

For the reasons set forth above, Morris's motion for attorneys' fees and costs pursuant to 42 U.S.C. § 1988 is granted. Morris and her attorneys are awarded fees of $154,900 and costs of $25,000 for a total award of fees and costs of $179,900. The Clerk of the Court is directed to enter a supplemental judgment accordingly.

SO ORDERED.