08-4245-pr, 08-4300-pr
Perez v. Westchester County Dep't of Corr.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued:    July 10, 2009                                    Decided: November 19, 2009)

Docket No. 08-4245-pr, 08-4300-pr

_____

HENRY PEREZ, SHEDRET WHITEHEAD, JULIO ROSA, CARMELO GONZALEZ,

*Plaintiffs-Appellees-Cross-Appellants*,

-v.-

WESTCHESTER COUNTY DEPARTMENT OF CORRECTIONS, as a county agency,
ROCCO POZZI, individually and as the commissioner of the Westchester County Department of
Corrections, ANTHONY AMICUCCI, individually and as the Senior Administrator of the
Westchester County Jail, CAPTAIN ORLANDO, individually and as facility grievance
coordinator of the Westchester County Jail,

*Defendants-Appellants-Cross-Appellees*.

_____

Before: CALABRESI and LIVINGSTON, *Circuit Judges*, and KORMAN, *District Judge*.[*]

Appeal and cross-appeal from a judgment of the United States District Court for the

Southern District of New York (Berman, *Judge*).  The District Court held (1) that Plaintiffs were

_____

[*] The Honorable Edward R. Korman, Senior Judge of the United States District Court for
the Eastern District of New York, sitting by designation.

1

"prevailing parties" under *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001), and thus eligible for fees pursuant to 42 U.S.C. § 1988, and (2) that the resulting award was subject to the fee cap of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(d). We hold (1) that Plaintiffs are prevailing parties, as they achieved a material alteration in the legal relationship between the parties, and the so-ordered settlement bore judicial imprimatur, and (2) that the PLRA's fee cap applies even though some plaintiffs were released from prison after the filing of the suit but before the successful resolution of the litigation. We also find that the District Court did not abuse its discretion in determining the fee award. Accordingly, we AFFIRM the judgment of the District Court, and REMAND for an award of fees in connection with this appeal.

RICHARD COHEN (Donia F. Sawwan, Samantha H. Evans, Kathleen M. Aiello, Matthew Bettinger, *of counsel*), Fox Rothschild LLP, New York, N.Y., *for Plaintiffs-Appellees-Cross-Appellants*.

MARY LYNN NICOLAS and MARTIN G. GLEESON, Associate County Attorneys (Stacey Dolgin-Kmetz, Chief Deputy County Attorney, *of counsel*), *for* Charlene M. Indelicato, Westchester County Attorney, *for Defendants-Appellants-Cross-Appellees*.

CALABRESI, *Circuit Judge*:

Plaintiffs, a group of practicing Muslims who are or were inmates at the Westchester County Jail, sued the Westchester County Department of Corrections (the "County") and three of its employees (collectively, "Defendants") for their refusal to provide Halal meat to Muslim

inmates, allegedly in violation of the First, Eighth, and Fourteenth Amendments. Prior to the initiation of Plaintiffs' suits, Defendants served Halal meat to Muslim inmates only twice a year; by contrast, they provided Kosher meat to Jewish inmates four to five times a week. Although Defendants initially rebuffed Plaintiffs' demand that Muslim inmates be given Halal or Kosher meat[1] with the same frequency as Jewish inmates, they ultimately agreed to do so in exchange for the dismissal of the lawsuits. The parties memorialized this agreement in an "Order of Settlement, Release and Stipulation of Discontinuance" (the "Order of Settlement"), which the District Court (Berman, *Judge*) entered on March 12, 2008. Subsequently, the District Court granted Plaintiffs' motion for attorneys' fees.

Defendants appealed from the award of attorneys' fees, claiming that Plaintiffs were not "prevailing parties" under *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001), and hence were not entitled to attorneys' fees, and that, alternatively, the District Court abused its discretion in determining the amount of fees to be awarded. Plaintiffs cross-appealed, claiming that the District Court erred in applying the fee cap of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(d), in this case, because the Order of Settlement expressly allowed Plaintiffs to move for attorneys' fees and because—they asserted—the fee cap does not apply to suits brought by prisoners who are released subsequent to the filing of a suit. We reject all three of these claims, and AFFIRM the judgment of the District Court in its entirety. We also REMAND the matter to the District Court to consider Plaintiffs' request for fees accrued in connection with this appeal.

---

[1] Kosher meat is prepared in a way that satisfies all the requirements of Halal meat. Hence, Kosher meat is Halal, even though Halal meat is not necessarily Kosher.

# I. Background

## A. The Plaintiffs' Allegations

Plaintiffs alleged that for over twenty years, the County violated the constitutional rights of Muslim inmates by serving them meat that was "Haram" (in violation of their beliefs) as opposed to "Halal" (which is consistent with their beliefs). While the County ostensibly provided a "Muslim diet tray," it often included Haram meat and was only occasionally consistent with Muslim dietary practices. As the County's Supervisor of Food Services swore in an affidavit, the County's food vendor did not "serve halal meat in any of the jail facilities," although Muslim inmates did receive "halal meat on two Muslim holidays during the year." By contrast, the County accommodated Jewish inmates' religious beliefs by serving them Kosher meat approximately four or five times a week. While the Kosher meat prepared regularly for Jewish inmates was Halal and thus would have satisfied the Muslim inmates' restrictions, the County refused to include it on the Muslim diet tray.

These practices persisted despite years of protests and grievances by Muslim inmates and by the jail's Muslim chaplain. In response to these complaints, Plaintiffs alleged, the County's systematic practice was either to "refuse an inmate's request to pursue the grievance process, to issue the same 'stock response', or to refuse to change . . . ." In denying inmate grievances, the County stated plainly that "Halal is not provided in this facility at this time."

Making these allegations, Plaintiff Henry Perez filed a Complaint *pro se* against the County on September 20, 2005, and sought injunctive and monetary relief pursuant to 42 U.S.C. § 1983. He alleged that the County's conduct violated his First Amendment right to free exercise of religion, his Eighth Amendment right to be free from cruel and unusual punishment, and his

4

Fourteenth Amendment right to due process and equal protection. Subsequently, twelve other *pro se* inmates filed nearly identical complaints.[2] By order dated November 29, 2005, the District Court consolidated all actions filed prior to that date.

After filing their Complaints, ten of the plaintiffs retained Richard Cohen, then of the firm Akabas & Cohen, as *pro bono* counsel. After Akabas & Cohen dissolved, Cohen joined Fox Rothschild ("Fox"), and thereafter, each of the ten retained Fox as substitute *pro bono* counsel.

**B.     The Defendants' Initial Responses to the Lawsuits**

In February 2006, Cohen met with representatives of the Defendants, who offered to change the Muslim diet tray—but only to the extent of removing meat altogether and providing substitutes such as peanut butter. On September 14, 2006, the County moved, *inter alia*, to dismiss Plaintiffs' Complaints. In their motion papers, Defendants asserted that:

> Plaintiffs' claims against County Defendants for relief pursuant to [§ 1983] for the denial of halal meat and/or kosher food has [sic] 4been repeatedly rejected and simply does not amount to a violation of a constitutional right. Plaintiffs have been provided with a halal diet that is consistent with their nutritional needs and religious beliefs. . . . Moreover, Plaintiffs' equal protection claim clearly fails as County Defendants provide both Muslim and Jewish inmates with nutritionally adequate meals that conform to their respective faith's requirements.[3]

The County also argued that Plaintiffs failed to exhaust administrative remedies and failed to demonstrate any facts that amounted to a constitutional violation, and that Defendants were in

---

[2] The thirteen plaintiffs are Henry Perez, Carmelo Gonzalez, Julio Rosa, Shedret Whitehead, Tuere Barnes, Anuedy Vincente, Stephen Morgan, Kenneth Wilson, Robert Massa, Angel Torres, Richard Simpson, Khalid Barnes, and Yero Pack. One of the plaintiffs, Khalid Barnes, also included causes of action under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*, and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq.*

[3] Defendants submitted affidavits from the County's Supervisor of Food Services for the facility, as noted above, and from an employee of its outside vendor. Both acknowledged that the facility's food vendor did not serve any Halal meat.

any event entitled to qualified immunity. Plaintiffs opposed the motion and cross-moved for a preliminary injunction directing the County (1) to provide either Halal or Kosher meat to Muslim inmates with the same frequency as Kosher meat was served to Jewish inmates, and (2) to refrain from putting Haram meat on the Muslim tray. In response to the preliminary injunction motion, the County argued that (1) it had attempted to satisfy the concerns of Plaintiffs by serving them a vegetarian diet; and (2) providing Plaintiffs with Kosher meals would be a significant financial burden on the County since Kosher meals were more expensive than regular meals.

On April 30, 2007, the District Court granted in part and denied in part the County's motion to dismiss, and denied Plaintiffs' cross-motion for a preliminary injunction without prejudice. *Perez v. Westchester County Dep't of Corr.*, No. 05 Civ. 8120, 2007 U.S. Dist. LEXIS 32638 (S.D.N.Y. Apr. 30, 2007). Specifically, the District Court dismissed the Plaintiffs' Eighth Amendment claims, but denied the County's motion as to the First and Fourteenth Amendment claims. In reaching this decision, the District Court commented on the strength of Plaintiffs' claims, noting, for example, that "the heart of the matter is Plaintiffs' (seemingly unrefuted) allegation that Defendants refuse to offer Muslim inmates the same kosher meat provided to Jewish prisoners," and that Plaintiffs were "(relatively easily) able to surmount Defendant's motion [to dismiss the equal protection claims]."

As for the preliminary injunction, the District Court found that Plaintiffs had shown irreparable injury and might succeed on the merits because they "may be able to show that there is disparate treatment among Muslim and Jewish inmates." But the District Court found that disputed issues of fact existed regarding the alleged financial burden that serving Halal or Kosher meat to Muslim inmates would place on the County. Because preliminary injunctions should not

6

be decided on the basis of affidavits when disputed issues of fact exist, the District Court found that an evidentiary hearing was required. It therefore dismissed the preliminary injunction motion without prejudice, explicitly allowing the Plaintiffs to reinstate their application "if and when Plaintiffs request a hearing on the injunction and/or the merits."

**C.    Settlement Negotiations and the "So-Ordered" Settlement Agreement**

In its April 30 order, the District Court also directed the parties to "appear at a scheduling/settlement conference with principals (or authority) before the Court" ten days later. At the conference, Judge Berman actively urged settlement, and made it clear that he felt the law was on Plaintiffs' side. When the County offered to provide Halal meat to Muslim inmates once a week and not provide any money in damages (an offer Plaintiffs' counsel Cohen analogized to allowing Rosa Parks to sit at the front of the bus on Mondays only), Judge Berman opined that, from a settlement perspective, it didn't sound "like much of a settlement to propose once a week for 3 inmates to have kosher meals when . . . Jewish inmates receive kosher meals 4 or 5 times a week." The County commented that "it's obvious that [Plaintiffs] are not going to accept any form of settlement unless we give them Halal meat the same number of times that the Jewish inmates get kosher meat," to which Judge Berman responded, "Remind me again why that shouldn't be the case?" Judge Berman extensively probed the County's arguments that providing Halal meat as often as it provided Kosher meat would be either a cost problem or a security threat, warning that the County's estimated expense of $30,000 a year didn't sound as if it supported a "good faith argument" and making it clear that the County's security argument seemed no more plausible. At the close of the conference, Judge Berman set an unusually short time frame for discovery and a trial date just five months away. He explained:

7

I am actually going to give you a little less time because the issues are very simple and I think the basic issues are known. . . . [T]his couldn't be more obvious and couldn't be more simple as to what is going on here and the question is whether these Muslim inmates are entitled to be treated like the Jewish inmates. It's really that simple. I am not saying I know the answer to that question and even if I come up with an answer somebody may think it's wrong. But that is the whole story here.

So, frankly, I think we have been wasting a lot of time already because I would [have] thought this was such an obvious case to be resolved . . . .

Judge Berman conducted another settlement conference on July 30, 2007, at which the Defendants proposed that instead of offering Halal meat once a week, they would serve Halal meat with the same frequency as Kosher meat to the Jewish inmates. Judge Berman commented that "that's where the law would bring you, but that's another story," and ordered Cohen to check with the ten Plaintiffs who were no longer incarcerated to see if they would accept this relief or wanted to pursue money damages.[4] After the County expressed opposition to entering a consent decree, Judge Berman acknowledged that "even the phrase consent decree is pejorative in some contexts," and discussed other ways to memorialize the agreement and guarantee to the Plaintiffs that the County would comply with the settlement.

On March 12, 2008, the parties entered a "Settlement, Release, and Stipulation of Discontinuance," which recited the terms of the agreement. Pursuant to the agreement, the County agreed to provide all present and future Muslim inmates of the Westchester County Jail who request a Halal diet with Halal meat with the same frequency as Kosher meat is served to Jewish inmates requesting the Kosher diet. The County made this change "in contemplation of settling" the lawsuit and in consideration of Plaintiffs' discontinuing their actions. The settlement did not constitute an admission of liability. While the agreement expressly indicated

---

[4] One plaintiff settled monetary damages with the County for $1000. This settlement was memorialized in a separate agreement that was "so-ordered" by the court.

8

that it was "not a consent decree," the dismissal of the lawsuits only took effect "[u]pon the Court's approval and entry of this Stipulation and Order." As for attorneys' fees, the settlement agreement provided that Plaintiffs expressly reserved the right to file for attorneys' fees and that the County had the right to oppose such a motion.

The District Court reviewed and revised the settlement agreement with the parties present. Judge Berman made three changes to the document that the parties had presented to the Court: First, he amended the caption of the document to reflect that it was an "Order of" Settlement. Second, where the settlement agreement provided that Plaintiffs retained the right to bring an action if the County failed to comply with the settlement and that Plaintiffs "are permitted to request referral of those claims to Judge Richard Berman," he added that "[t]his Court retains discretion to accept any such case(s) as [may be] related." Third, he instructed the clerk to close the case, and "so-ordered" the settlement.

**D.** **The District Court's Judgment on Attorneys' Fees**

Following the settlement agreement, Plaintiffs' counsel, Cohen, filed an application for attorneys' fees pursuant to 42 U.S.C. § 1988(b) in the amount of $202,056.50. Cohen first argued that Plaintiffs were "prevailing parties" because the so-ordered settlement materially altered the legal relationship between the parties and the settlement had sufficient judicial imprimatur to warrant attorneys' fees under § 1988(b). Second, he argued that the PLRA fee cap should not apply, both because the Order of Settlement allowed the Plaintiffs to move for attorneys' fees outside the cap, and because the cap does not apply to former prisoners who are no longer incarcerated. Third, he argued that the fees applied for were reasonable, particularly in light of the fact that counsel was not seeking approximately $95,000 in (1) fees for legal services

9

performed before Cohen joined Fox, (2) costs, and (3) fees for filing the fee application ("fees on fees").

Defendants contested each of these arguments. First, they asserted (1) that Plaintiffs were not "prevailing parties" because the County's change of conduct was voluntary and the legal relationship between the parties was not altered, and (2) that there was insufficient judicial imprimatur because the District Court did not retain jurisdiction to enforce the settlement, the settlement agreement was not a consent decree, and the District Court had closed the case. Next, assuming that Plaintiffs were entitled to fees, the County argued that the PLRA fee cap should apply, as it covers all lawsuits that are *filed* by a prisoner, not just those that are completed while the plaintiffs are still incarcerated. Lastly, the County argued that the 743.5 hours that Fox Rothschild claimed were excessive and unreasonable and that many of the fees sought were redundant, duplicative, or otherwise unwarranted.

On July 22, 2008, the District Court awarded Fox fees in the amount of $99,658.48. The Court held that Plaintiffs were "prevailing parties" because (1) the Order of Settlement "materially altered the [parties'] legal relationship" and (2) there was "ample evidence" of judicial imprimatur as the court denied the motion to dismiss, held several settlement conferences, participated in an effort to resolve contested issues, and then reviewed, revised, and so-ordered the settlement. The District Court found that the language of the PLRA cap, which refers to "any action brought by a prisoner who is confined to any jail, prison, or other correctional facility," 42 U.S.C. § 1997e(d)(1), limited Fox's fees because the Plaintiffs were prisoners at the time of filing. Then, after reviewing the fee application, the Court held that the number of hours billed was reasonable. Based on the fee cap, the District Court reduced the

10

requested hourly rates to $138 per hour for attorneys and $80 per hour for paralegals, and awarded Fox $99,658.48.

**E.     Appeal**

Defendants timely appealed, reasserting the arguments they made in their opposition to Plaintiffs' fee application. Plaintiffs cross-appealed, arguing that the District Court erred in applying the PLRA fee cap.

## II. Discussion

**A.     Standard of Review**

Whether Plaintiffs are prevailing parties under *Buckhannon* is a question of law that we review *de novo*. *See, e.g.*, *Pres. Coal. of Erie County v. Fed. Transit Admin.*, 356 F.3d 444, 450-51 (2d Cir. 2004). Similarly, we review the District Court's interpretation of the PLRA fee cap provision *de novo*. *See, e.g.*, *United States v. Santos*, 541 F.3d 63, 67 (2d Cir. 2008). The District Court's calculation of reasonable attorneys' fees, on the other hand, will stand unless we find it to be an abuse of discretion. *See, e.g.*, *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1159 (2d Cir. 1994).

**B.     Plaintiffs Are "Prevailing Parties" Under *Buckhannon***

The first issue before us is Defendants' argument that Plaintiffs are not "prevailing parties" under 42 U.S.C. § 1988(b). "[I]n order to be considered a 'prevailing party' . . . , a plaintiff must not only achieve some material alteration of the legal relationship of the parties, but that change must also be judicially sanctioned." *Roberson v. Giuliani*, 346 F.3d 75, 79 (2d Cir. 2003) (internal quotation marks omitted); *see also Buckhannon*, 532 U.S. at 604-05.[5] That

---

[5] *Buckhannon* concerned the fee-shifting provisions of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3613(c), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12205, rather than § 1988(b). As we

11

is, plaintiffs are only eligible for attorneys' fees if they "achieve some material alteration of the legal relationship" between them and their adversaries, *and* that change bears a "judicial imprimatur." *Roberson*, 346 F.3d at 79-80. We find both prongs satisfied in view of the course of the litigation below.

1.      *Material Alteration of the Legal Relationship*

Defendants' first argument, that it began serving Halal meat voluntarily and that the legal relationship between the parties was unaltered, requires little discussion. At several points during the litigation, Defendants acknowledged that they did not serve Halal meat to Muslim inmates as often as they served Kosher meat to Jewish inmates and did not want to do so. Indeed, their first settlement offer proposed that they serve Halal meat once a week, and the County's lawyer criticized Plaintiffs' apparent position that they would not "accept any form of settlement unless [the County] give[s] them Halal meat the same number of times that the Jewish inmates get kosher meat." As the Order of Settlement explicitly states, the County only changed its conduct "in contemplation of settling the . . . lawsuits." There is thus no merit to the County's contention that it changed its practices on its own and independent of the lawsuit.

More importantly, the County is now legally incapable of acting as it did before the entry of the Order. The Order of Settlement specifically directs, *inter alia*, that the County "shall" continue to provide Halal meat to Muslim inmates who request a Halal diet as often as it provides Kosher meat to Jewish inmates who request a Kosher diet, and the County's actions are now governed by a ten-part procedure that is an express condition of the dismissal of the

have previously held, however, "the standards used to interpret the term prevailing party under any given fee-shifting statute are generally applicable in all cases in which Congress has authorized an award of fees to a prevailing party." *J.C. v. Reg'l Sch. Dist. 10*, 278 F.3d 119, 123 (2d Cir. 2002) (internal quotation marks omitted).

12

lawsuits. Assuming the unlikely, that Defendants' constitutional arguments were correct and the County was free to serve Halal meat to Muslim inmates less often than it served Kosher meat to Jewish inmates, it cannot now do so without violating *a Court order*. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (noting that where an order of dismissal "incorporat[es] the terms of [a] settlement agreement . . . , a breach of the agreement would be a violation of the order"). Whether the County's initial decision to serve Halal meat at the appropriate frequency was voluntary or not is thus inconsequential, as it can no longer freely reverse that decision.

2.    *Judicial Imprimatur*

Defendants' second contention is also unpersuasive. Under *Buckhannon*, Defendants argue, only three outcomes have the requisite judicial imprimatur: a judgment on the merits, a consent decree, or "a judicially enforceable settlement agreement." So-ordered settlements that do not explicitly provide for the retention of jurisdiction, like the one here, fall into none of these three categories, the argument continues, and therefore Plaintiffs are not prevailing parties. But nothing in *Buckhannon* or its sequelae limits judicial imprimatur to these three narrow categories, hence Defendants' major premise is incorrect.

The judicial imprimatur test grows out of *Buckhannon*, in which the Supreme Court considered and rejected the "catalyst theory" that was, at the time, the law of this Court (and of the majority of circuits) for gauging whether the prevailing parties requirement was met. *See, e.g., Marbley v. Bane*, 57 F.3d 224, 234 (2d Cir. 1995). Under the catalyst theory, a plaintiff prevailed for the purpose of fee-shifting provisions whenever her lawsuit "had sufficient merit to withstand a motion to dismiss" and "brought about a voluntary change in the defendant's

13

conduct." *Buckhannon*, 532 U.S. at 601, 605. The Supreme Court held that this interpretation was inconsistent with the definition of "prevailing parties" when used as a term of art. *Id.* at 603. Instead, the Court held, plaintiffs must receive "some relief on the merits" to be termed prevailing parties, as, for example, when they win a judgment on the merits or obtain "settlement agreements enforced through a consent decree." *Id.* at 603-04 (internal quotation marks omitted). In a footnote, the Court added that "[p]rivate settlements do not entail the judicial approval and oversight involved in consent decrees. And federal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal." *Id*. at 604 n.7.

Although the Supreme Court specifically mentioned merits decisions and consent decrees, it did not suggest that one of these two conditions was necessary for a party to prevail. Indeed, it referred to them as "examples" of sufficient outcomes. *Id.* at 605. Accordingly, we held in *Roberson* that "judicial action other than a judgment on the merits or a consent decree can support an award of attorneys' fees, so long as such action carries with it sufficient judicial imprimatur." *Roberson*, 346 F.3d at 81. We then went on to consider the status under *Buckhannon* of a dismissal order that did not incorporate the terms of a settlement agreement but did provide that the district court would "retain jurisdiction . . . for enforcement purposes." *Id.* at 78. In examining this question, we looked to *Kokkonen*, in which the Supreme Court held that a federal district court could not exercise jurisdiction over the enforcement of a settlement agreement where its order of dismissal neither incorporated the terms of the settlement agreement nor included a provision retaining jurisdiction. But the Court stated quite clearly that a district court *could* exercise jurisdiction in the two above-mentioned scenarios. As the Court wrote:

14

We have recognized inherent authority to appoint counsel to investigate and prosecute violation of a court's order. But the only order here was that the suit be dismissed, a disposition that is in no way flouted or imperiled by the alleged breach of the settlement agreement. The situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal—either by separate provision (such as a provision "retaining jurisdiction" over the settlement agreement) or by incorporating the terms of the settlement agreement in the order. In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist.

*Kokkonen*, 511 U.S. at 380-81 (internal citations omitted).[6]

*Roberson* dealt with the first hypothetical situation discussed in *Kokkonen*: an order of dismissal retaining jurisdiction over a settlement agreement, but not otherwise referencing its terms. We noted that *Buckhannon* had cited this portion of *Kokkonen* approvingly, and had reaffirmed that "federal jurisdiction to enforce a private contractual settlement" could exist where "the terms of the agreement are incorporated into the order of dismissal." *Buckhannon*, 532 U.S. at 604 n.7; *see Roberson*, 346 F.3d at 81. We went on to state that:

[v]iewed in the light of *Kokkonen*, the district court's retention of jurisdiction in this case is not significantly different from a consent decree and entails a level of judicial sanction sufficient to support an award of attorney's fees. First, despite the district court's statements that it had not specifically reviewed or approved the terms of the settlement agreement, the district court retained jurisdiction to enforce the Agreement. Under *Kokkonen*, when the district court retained jurisdiction, it necessarily made compliance with the terms of the agreement a part of its order so that "a breach of the agreement would be a violation of the order." Further, because the court has the general responsibility to ensure that its orders are fair and lawful, it retains some responsibility over the terms of a settlement agreement as the parties' obligation to comply with the agreement was made a part of its order.

---

[6] Defendants look to *Kokkonen* for support, as well as *Torres v. Walker*, 356 F.3d 238 (2d Cir. 2004), and *Hester Industries, Inc. v. Tyson Foods, Inc.*, 160 F.3d 911 (2d Cir. 1998). All three cases involved so-ordered stipulations of dismissal that neither retained jurisdiction to enforce the underlying settlements nor incorporated the settlements' terms. Because the Order of Settlement at issue in this case explicitly does incorporate the terms of the agreement, *Kokkonen*, *Torres*, and *Hester* do not control this case.

15

*Id.* at 82 (citation omitted). We held that, as the Fourth Circuit had previously also concluded, "[a] court's responsibility to ensure that its orders are fair and lawful stamps an agreement that is made part of an order with judicial imprimatur." *Id.* at 83 (quoting *Smyth v. Rivero*, 282 F.3d 268, 282 (4th Cir. 2002)). Such ongoing inherent authority made orders of dismissal in which the district court retained jurisdiction to enforce the underlying settlement agreement indistinguishable from consent decrees for the purposes of *Buckhannon*. As a result, we concluded that the *Roberson* plaintiffs were entitled to seek fees. *Id.* at 83-84.

We have never squarely considered the second *Kokonnen* scenario, that of an order of dismissal that explicitly incorporates the terms of a settlement, as does the Order of Settlement before us today. But the logic of *Roberson* suggests that such orders must satisfy *Buckhannon*. At the end of a footnote in *Torres v. Walker*, 356 F.3d 238 (2d Cir. 2004), however, we stated in dicta that "*Buckhannon* requires not only the physical incorporation of the settlement in a district court's order but also some evidence that a district court *intended* to place its 'judicial imprimatur' on the settlement." *Id.* at 244 n.6 (emphasis added). Whatever the significance of this remark, it is plain that, even under the *Torres* footnote, there is ample evidence in the instant case that the District Court "intended to place its 'judicial imprimatur' on the settlement." *Id.*

The Order of Settlement provided that Plaintiffs' lawsuits would only be dismissed "[u]pon the Court's approval and entry of this Stipulation and Order." This is not a case where "[d]ismissal was effectuated by stipulation, or mutual agreement of the parties, and did not require any judicial action," *Hester Indus., Inc. v. Tyson Foods, Inc.*, 160 F.3d 911, 916 (2d Cir.

16

1998); rather, the settlement was only made operative by the Court's review and approval. In a quite literal sense, it was the District Court's imprimatur that made the settlement valid.[7]

Furthermore, this language is characteristic of another source of the requisite imprimatur. The record demonstrates beyond peradventure Judge Berman's extensive involvement and close management of the case. He played an integral role in the resolution of the suit, he advised the parties on how they should expect the law to come out, he suggested appropriate settlement terms, and he directed counsel to conduct settlement negotiations and to bring settlement offers back to their respective parties. When the parties brought the outlines of the ultimate settlement proposal to the Court, Judge Berman pressed Defendants' counsel on the need to make the agreement part of an enforceable stipulation. Here again, we find strong evidence that Judge Berman judicially sanctioned the settlement. *Cf. Buckhannon*, 532 U.S. at 618 (Scalia, J., concurring) ("In the case of court-approved settlements . . . , even if there has been no judicial determination of the merits, the outcome is at least the product of, and bears the sanction of, judicial action *in the lawsuit*. There is at least *some* basis for saying that the party favored by the settlement . . . prevailed *in the suit*.").[8]

We, therefore, conclude that the evidence considered together makes manifest that the Order of Settlement bore the imprimatur of the District Court. *Buckhannon* is satisfied, and Plaintiffs qualify as "prevailing parties" under 42 U.S.C. § 1988(b).

---

[7] As Black's Law Dictionary notes, *imprimatur* means literally, "let it be printed." Black's Law Dictionary 825 (9th ed. 2009).

[8] Judge Berman's belief that he had given the settlement his sanction, evident in his *Buckhannon* analysis, is not without significance. As we noted in *Torres*, the imprimatur inquiry is in some regard about the intent of the district court. See *Torres*, 356 F.3d at 245 n.6 (describing *Buckhannon* as requiring "evidence that a district court *intended* to place its 'judicial imprimatur' on the settlement" (emphasis added)). While a district judge's own opinion as to whether or not his actions provide imprimatur cannot be controlling, it might in a close case, unlike this one, shed light as to how ambiguous actions should be understood.

17

## C. The PLRA Fee Cap Applies to Plaintiffs' Suits

We must also decide whether the PLRA's fee cap applies to Plaintiffs' suits. The PLRA limits the availability of attorneys' fees under § 1988 "[i]n any action brought by a prisoner who is confined to any jail, prison, or other correctional facility." 42 U.S.C. § 1997e(d)(1). One of the ways it does this is by capping the fees that a court can award at an hourly rate no greater than 150 percent of the hourly rate established by the Judicial Conference for payment of court-appointed counsel in a given district. *Id.* § 1997e(d)(3).[9] Plaintiffs argue that this cap does not apply, for two reasons. First, they claim, the Order of Settlement exempted their suits from the fee cap by explicitly allowing Plaintiffs to move for attorneys' fees. Second, they argue, the fee cap applies only to prisoners who are still incarcerated at the time of their case's resolution. We hold against Plaintiffs on both grounds.

### 1. The Text of the Order of Settlement

Plaintiffs first claim that the Order of Settlement "explicitly exempted this case from the PLRA fee cap." For support, they point to the following language:

> (i) Plaintiffs expressly reserve the right to move [the District Court], pursuant to any state or federal statute or common law for payment of their respective attorneys fees and reimbursement of costs and expenses, (ii) Plaintiffs shall be permitted to file the appropriate motion for attorney's fees and costs with this Court as Plaintiffs deem fit and; (iii) County Defendants shall have an opportunity to oppose any such motion for attorney's fees and reimbursement of costs and expenses.

By explicitly reserving to Plaintiffs the right to move for fees and not explicitly reserving to Defendants a PLRA fee cap defense, Plaintiffs argue, this language exempted their case from the fee cap.

---

[9] The District Court found that the PLRA allows for an hourly rate of $138 in the Southern District, and neither party has suggested otherwise.

The language on which Plaintiffs rely, however, does not support this conclusion. It only reserves to Plaintiffs the right to move for fees "pursuant to any state or federal statute or common law." That is, it only allows the Court to award such fees as are otherwise authorized by law—specifically, fees under § 1988, which are limited by the PLRA.[10] Rather than providing Plaintiffs with a new claim for fees, subject only to the District Court's discretion, the language simply preserves to Plaintiffs a right they already had (but might perhaps have been deemed to have relinquished, had the Order of Settlement been silent on the issue).

*Torres*, upon which Plaintiffs rely, is not to the contrary. In *Torres*, as discussed *supra* n.5, we found that plaintiffs were not prevailing parties because the district court had merely so-ordered a stipulation of dismissal, and had not incorporated the terms of the settlement. *Torres*, 356 F.3d at 242-45. Accordingly, in *Torres* fees could not be awarded under § 1988. Because the PLRA fee cap affects *only* actions "in which attorney's fees are authorized under [§ 1988]," 42 U.S.C. § 1997e(d)(1), it had no application to *Torres*. The reference in the *Torres* order to allowing plaintiffs to obtain fees could only be interpreted as providing independent contractual authority for fee-shifting. Moreover, as we noted in *Torres*, the language of that stipulation "plainly and unambiguously provided for the payment of Torres' reasonable attorneys' fees, *to be determined by the District Court*." *Torres*, 356 F.3d at 245 (emphasis added). The instant settlement contains no similar language.

2. *The Fee Cap's Application to Released Prisoners*

---

[10] Plaintiffs identify no applicable ground for fee-shifting under state law or common law, and we can think of none. Section 1988 is, of course, an exception to the general American common law rule that parties bear their own fees. *See Buckhannon*, 532 U.S. at 602-03.

Plaintiffs also argue that the plain text of the PLRA applies only to prisoners who are still incarcerated at the time of the successful resolution of their suits, and has no application to plaintiffs who were incarcerated when they filed suit but who have since been released. They rely heavily on *Morris v. Eversley*, 343 F. Supp. 2d 234 (S.D.N.Y. 2004), in which Judge Chin conducted a thoughtful analysis of the question and concluded that the fee cap applied only to currently incarcerated prisoners. Plaintiffs, following *Morris*, point to the statutory text, which applies the fee cap to "any action brought by a prisoner *who is confined to any jail, prison, or other correctional facility*." 42 U.S.C. § 1997e(d)(1) (emphasis added). The highlighted portion, the argument runs, must refer to the status of the plaintiff at the *conclusion* of the suit, rather that its inception, or else it would be redundant. For, they assert, a "prisoner" is, by definition, an individual "confined to [a] jail, prison, or other correctional facility." *See Morris*, 343 F. Supp. 2d at 241. Additionally, they argue, Congress intended the PLRA to curb *frivolous* lawsuits, not meritorious ones. As a result, they contend, any ambiguities should be construed in ways that are favorable to successful (and, by implication, meritorious) suits. *See id.* at 241-42. Finally, they say, applying the fee cap to released prisoners would give rise to "absurd" results. It would create a senseless disparity between prisoners who file toward the end of their incarceration and those who wait until their release to file. Even more absurdly, it would create incentives for prisoners to withdraw suits filed while in jail, only to refile their claims upon the prisoners' release. *See id.* at 244.

While not without some merit, these arguments do not persuade us. First, we believe that the text of the PLRA, although not entirely unambiguous, is most naturally read as referring solely to a plaintiff's status at the time of *filing*, not at subsequent stages of the proceedings. The

20

act applies to "any action *brought* by a prisoner who is confined to any jail, prison, or other correctional facility." § 1997e(d)(1) (emphasis added). Its only temporal hook is to the time the action is *brought*—that is, when it is filed. *See Jackson v. State Bd. of Pardons & Paroles*, 331 F.3d 790, 795 (11th Cir. 2003) ("[T]he term 'brought' as used in § 1997e(d)'s 'in any action brought' language means filed."). The reference to a prisoner's "confine[ment in] any jail, prison, or other correctional facility" thus seems to describe the status of a plaintiff at the time of filing, not that of the plaintiff at some later time.

Nor do we find the redundancy that Plaintiffs say attaches to such a reading. Plaintiffs are right, of course, that we construe statutes to avoid surplusage whenever possible. *See, e.g.*, *Cal. Pub. Employees' Ret. Sys. v. Worldcom, Inc.*, 368 F.3d 86, 106 (2d Cir. 2004) ("Statutes should be construed, if possible, to give effect to every clause and word."). But our understanding of § 1997e(d)(1) does not leave us with a bare redundancy. The phrases "prisoner" and "confined to any jail, prison, or other correctional facility" are *not* synonymous. The term "prisoner," as defined in the PLRA, "means any person incarcerated or detained *in any facility* who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." § 1997e(h) (emphasis added). The fee cap, instead, applies to only three types of facilities: jails, prisons, and other correctional facilities in which a prisoner may be confined. § 1997e(d)(1). As a result, some "prisoners" are not made subject to the fee cap: for example, those incarcerated or detained in medical facilities or mental institutions. Without going further into the matter, we conclude that Plaintiffs' reliance on the canon against surplusage is misplaced.

21

Contrary to Plaintiffs' claim, we also do not believe that applying the fee cap to suits *filed* when Plaintiffs are incarcerated produces "absurd results." True, the fee cap draws a distinction between otherwise identical claims, leading one plaintiff to file while incarcerated and others to wait until their release from incarceration to file suit. *Cf. Doe v. Wash. County*, 150 F.3d 920, 924 (8th Cir. 1998) (holding that the fee cap does not apply to suits brought by former prisoners). But this is not a wholly artificial distinction; Congress may well have thought that persons still incarcerated were more inclined to bring suits than those who were back in the world and now had less time on their hands and better things to do with it. *See* Hearing on S. 3 and S. 866 Before the Senate Committee on the Judiciary, 104th Cong., 1995 WL 496909 (F.D.C.H.) (July 27, 1995) (prepared statement of O. Lane McCotter, Exec. Dir., Utah Dep't of Corrections) ("The driving force behind this flood of litigations is that inmates have 'nothing to lose' in filing even the most frivolous case . . . ."). Moreover, Plaintiffs' preferred reading would produce results at least as peculiar: a plaintiff who obtained a settlement or a verdict on the eve of her release would be covered by the fee cap, while one who obtained similar success immediately after her release would not. All in all, we conclude that the more likely textual reading survives any "absurdity" test.

**D.      The District Court Did Not Abuse Its Discretion in Calculating Fees**

Defendants argue that the District Court abused its discretion in declining to reduce its fee award for work that Defendants claim was "inconsistent," "duplicative, redundant, excessive and unreasonable." "The calculation of reasonable attorneys fees is a factual issue whose resolution is committed to the discretion of the district court." *Cruz,* 34 F.3d at 1159.[11] We see no abuse of

---

[11] Defendants do not assert that the District Court made any errors of law in its award, apart from their *Buckhannon* claim.

the District Court's discretion. Most of the items that Defendants contest would have been vital if the case proceeded to trial. Particularly considering that Defendants' initial position was to refuse adamantly the Plaintiffs' requests, and that the District Court set an accelerated trial schedule, these expenses seem entirely warranted. Similarly, none of Defendants' other complaints lead us to conclude that the District Court abused its discretion.

**E.     The District Court Should Consider Plaintiff's Request for Fees on Fees**

Finally, Plaintiffs request that we remand the case to the District Court so that it may award them attorneys' fees for the time spent defending their award on appeal ("fees on fees"). Defendants do not oppose this request. Such requests "should be granted whenever underlying costs are allowed." *Weyant v. Okst*, 198 F.3d 311, 316 (2d Cir. 1999). We therefore remand the case to the District Court to determine a reasonable fee award for Fox's work in connection with this appeal.

### III.  CONCLUSION

To summarize, we hold (1) that Plaintiffs in this case are prevailing parties and thus eligible for fees under 42 U.S.C. § 1988; (2) that the PLRA's fee cap applies to their suit; and (3) that the District Court did not abuse its discretion in determining the fee award. Accordingly, we AFFIRM the judgment of the District Court. We also REMAND the case to the District Court for the determination of a reasonable fee award for Fox's work in connection with this appeal.